**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

HECTOR GARCIA JR., as Personal Representative
to the Estate of HECTOR GARCIA

      Plaintiff,

v.                           No.

BOARD OF COUNTY COMMISSIONERS FOR
THE COUNTY OF DOÑA ANA, CORIZON HEALTH, INC.,
WARDEN VINCE POKLUDA, VERONICA SALAZAR,
CHRISTI BENNETT, MELISSA GARCIA, GLADYS HERNANDEZ,
HEATHER BARELA, EDUARDO BERUMEN, MARIO MACIAS,
DAYMAN RAMIREZ, and BRIAN VALLE,

      Defendants.

**COMPLAINT FOR THE RECOVERY OF DAMAGES**
**CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS**

      Plaintiff brings this complaint for damages caused by the violation of his civil and constitutional rights. Plaintiff files this complaint under the federal Civil Rights Act, and the Constitution of the United States. Plaintiff also brings claims under the New Mexico Tort Claims Act and the Wrongful Death Act.  In support of this Complaint, Plaintiff alleges the following:

**JURISDICTION AND VENUE**

1.  Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983 and 1988.

2.  Venue is proper as the acts complained of occurred exclusively within Doña Ana County, New Mexico.

**PARTIES**

3.  Plaintiff Hector Garcia Jr., as Personal Representative to the Estate of Hector Garcia, is an individual and resident of Doña Ana County, New Mexico.

1

4.   Plaintiff Hector Garcia Jr. was duly appointed in the State of New Mexico Third Judicial District Court as Personal Representative to the Estate of Hector Garcia for the purposes of maintaining a claim for damages arising out of the wrongful death of Hector Garcia under the Wrongful Death Act.

5.   Hector Garcia was an inmate in the custody and care of the Doña Ana County Detention Center (hereinafter "DACDC") from August 1, 2019 until his death on August 7, 2019. While incarcerated, Mr. Garcia was completely dependent upon DACDC for his care and well-being.

6.   Defendant Board of County Commissioners for the County of Doña Ana ("Board") is a governmental entity within the State of New Mexico and a "person" under 43 U.S.C. § 1983.

7.   At all times material to this Complaint, the Board was the employer of Defendants Vince Pokluda, Mario Macias, Dayman Ramirez, and Brian Valle.

8.   During all material times Defendant Corizon Health, Inc. ("Corizon") was responsible for providing medical care to inmates at DACDC pursuant to contract with Defendant Board.

9.   Defendant Corizon is a Delaware for Profit Corporation registered to do business in New Mexico.

10. At all material times, Defendant Corizon acted through its owners, officers, directors, employees, agents, or apparent agents including, but not limited to, administrators, management, nurses, doctors, technicians and other staff responsible for their acts or omissions pursuant to the doctrines of respondeat superior, agency or apparent agency.

11. At all material times, Defendant Vince Pokluda was employed by DACDC as the facility detention administrator with supervisory duties.

12. Defendant Pokluda was acting under the color of state law and within the scope of his employment at all material times.

13. Defendant Pokluda is being sued in his official capacity.

14. At all material times, Defendant Veronica Salazar was employed by Defendant Corizon as a registered nurse.

15. Defendant Salazar was acting under the color of state law and within the scope of her employment at all material times.

16. Defendant Salazar is being sued in her individual capacity only.

17. At all material times, Defendant Gladys Hernandez was employed by Defendant Corizon as a registered nurse.

18. Defendant Hernandez was acting under the color of state law and within the scope of her employment at all material times.

19. Defendant Hernandez is being sued in her individual capacity only.

20. At all material times, Defendant Heather Barela was employed by Defendant Corizon as a registered nurse.

21. Defendant Barela was acting under the color of state law and within the scope of her employment at all material times.

22. Defendant Barela is being sued in her individual capacity only.

23. At all material times, Defendant Eduardo Berumen was employed by Defendant Corizon as a nurse practitioner.

24. Defendant Berumen was acting under the color of state law and within the scope of his employment at all material times.

25. Defendant Berumen is being sued in his individual capacity only.

26. At all material times, Defendant Melissa Garcia was employed by Defendant Corizon as a nurse practitioner.

27. Defendant Garcia was acting under the color of state law and within the scope of his employment at all material times.

28. Defendant Garcia is being sued in her individual capacity only.

29. At all material times, Defendant Christi Bennett was employed by Defendant Corizon as a registered nurse.

30. Defendant Bennett was acting under the color of state law and within the scope of her employment at all material times.

31. Defendant Bennett is being sued in her individual capacity only.

32. At all material times, Defendant Mario Macias was employed by Defendant Board as a detention officer at DACDC.

33. Defendant Macias was acting under the color of state law and within the scope of his employment at all material times.

34. Defendant Macias is being sued in his individual capacity only.

35. At all material times, Defendant Dayman Ramirez was employed by Defendant Board as a detention officer at DACDC.

36. Defendant Ramirez was acting under the color of state law and within the scope of his employment at all material times.

37. Defendant Ramirez is being sued in his individual capacity only.

38. At all material times, Defendant Brian Valle was employed by Defendant Board as a detention officer at DACDC.

39. Defendant Valle was acting under the color of state law and within the scope of his employment at all material times.

40. Defendant Valle is being sued in his individual capacity only.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

41. On August 1, 2019, Hector Garcia was given a sentence of six days for his failure to pay $242 in fines.

42. That evening, Hector was booked into the Doña Ana County Detention Center ("DACDC") to serve this six-day sentence.

43. Hector had a history of peptic ulcers.

44. In previous stays at the jail, medical staff noted Hector had a history of these ulcers including at least one event when an ulcer was bleeding.

45. Shortly into his sentence, Hector began to experience symptoms consistent with a perforated ("burst") ulcer.

46. At approximately 5:53 p.m. on August 4, 2019, Hector collapsed in the housing pod.

47. Medical records indicate Hector was found face down on the floor moaning in pain.

48. Hector was vomiting and was described as having "dry heaves."

49. Hector asked for medical care.

50. Hector told Defendant Veronica Salazar, a nurse, that he had not eaten in four days.

51. Defendant Salazar sent Hector back to his pod without treatment.

52. Defendant Salazar made no attempt to have Hector seen by a higher-level provider.

53. Defendant Salazar was familiar with Hector and his medical history from previous stays in the jail.

54. Hector begged to be housed in medical.

55. Hector's requests were ignored.

56. Due to his history of drug use, Hector was placed on a withdrawal protocol called COWS.

57. This protocol is designed to provide extra medical observation of an inmate.

58. This extra medical observation is needed as untreated withdrawal is potentially fatal.

59. The COWS protocol requires frequent measurement of an individual's vital signs such as blood pressure and temperature.

60. The symptoms of withdrawal are assessed to see if the individual needs a higher level of care such as hospitalization.

61. Any competent medical provider in a jail would realize Hector was suffering symptoms of withdrawal.

62. Any competent medical provider in a jail setting knows untreated withdrawal is potentially fatal.

63. In addition to his symptoms of withdrawal, Hector was also suffering symptoms consistent with a perforated ulcer.

64. Any competent medical provider would realize Hector's symptoms required immediate emergent medical attention.

65. Throughout the night, Corizon medical staff failed to monitor Hector despite being required to do so as part of the COWS protocol.

66. At 10:53 a.m. on August 5, 2019, Hector again collapsed in the pod.

67. Video evidence of this event has been preserved.

68. Hector was found in the pod on his hands and knees.

69. Hector had vomited.

70. Hector was yelling in pain.

71. Hector was saying "help me."

72. When asked, Hector described his pain as 10 out of 10.

73. Hector's blood pressure was finally taken and noted to be abnormally high at 160/95.

74. Hector's pulse was taken and was noted to be "thready."

75. Hector informed staff he had not had a bowel movement in 3 or 4 days, a symptom inconsistent with withdrawal.

76. Withdrawal is often associated with diarrhea.

77. Medical staff knew that Hector had collapsed the previous day.

78. Defendant Bennett, as a registered nurse, knew that abdominal pain of such severity was a potentially life-threatening medical condition.

79. Defendant Bennett knew that high blood pressure and a thready pulse are medical conditions which cannot be faked.

80. Video of the incident demonstrates Hector was in so much abdominal pain he could not stand up.

81. Staff were required to help Hector into a wheelchair and take him to the medical department.

82. Defendant Garcia was the nurse practitioner on duty at that time.

83. Medical records indicate Defendant Garcia saw Hector for only 5 minutes and diagnosed him with constipation.

84. During this short examination, Hector told Defendant Garcia he thought he had cirrhosis of the liver.

85. Defendant Garcia did not attempt to get a history from Hector about his symptoms and she did not perform a review of symptoms associated with the complications of cirrhosis such as gastrointestinal bleeding.

86. Defendant Garcia knows that constipation is not associated with high blood pressure, thready pulse or such levels of pain.

87. A diagnosis of constipation for someone who has collapsed twice in a period of 24 hours and whose vital signs are abnormal demonstrates utter indifference to the pain and suffering of that individual.

88. At this time, Hector needed an assessment of his illness.

89. Hector needed to be transported to the nearest emergency room to make a proper diagnosis.

90. If Hector had collapsed with this sort of pain in any place other than a jail or prison, he would have been transported immediately to the nearest emergency room.

91. It would be obvious to any lay person that Hector needed to be transported to the emergency room for a higher level of care.

92. Hector was suffering from a perforated ulcer.

93. As time passes for someone with an untreated perforated ulcer, the contents of the bowel will enter the abdominal cavity.

94. When allowed to flow into the abdominal cavity, the contents of the bowel can cause infection which leads to sepsis and death if untreated.

95. A perforated ulcer is extremely painful.

96. Emergency rooms encounter perforated ulcers as a matter of routine.

97. Emergency surgery is usually required to treat the condition.

98. The symptoms of a perforated ulcer are well known in the medical community.

99. Surgical intervention of a perforated ulcer is usually successful at saving an individual's life.

100.     Defendant Garcia knew that abdominal pain of this type could be fatal if left untreated.

101.     After this second collapse, coupled with a worsening of his symptoms, Hector needed to be transported to the hospital, where his life could be saved.

102.     Any competent medical provider would not be willing to assume these symptoms were benign enough to merit a diagnosis of constipation.

103.     As the bowel fluid filled Hector's abdominal cavity, Hector's abdomen became distended.

104.     At 3:51 p.m., Defendant Hernandez noted that Hector's abdomen was distended and that he was still in pain rated at 10 out of 10.

105.     Defendant Hernandez also noted Hector was vomiting a dark brown or orange bile substance.

106.     Dark brown vomit can be an indication of blood and internal bleeding which requires immediate medical attention.

107.     Defendant Hernandez also noted that Hector's abdomen was painful to palpitation, a symptom associated with perforated ulcers.

108.     Despite these obvious signs and symptoms indicating a life-threatening condition, Defendant Hernandez did not call for a higher level provider or an ambulance.

109.     Later that afternoon, a mental health nurse saw Hector while he was housed alone in a segregation cell.

110.     This nurse indicated Hector had vomited blood onto the floor.

111.     This nurse also indicated Hector was suffering from hallucinations and that his uniform and cell were contaminated with bloody emesis and needed cleaning.

112.     This nurse told Defendant Bennett that Hector had been vomiting blood.

113.    Hector's symptomatology was so serious that Defendant Bennett had an obligation at this time to call an ambulance.

114.    At this point in time, all medical defendants associated with Hector's care should have called for an ambulance.

115.    Instead, all medical defendants did nothing to treat Hector's life-threatening condition.

116.    At 8:39 p.m., Defendant Heather Barela saw Hector for medical rounds.

117.    Defendant Barela described her patient as showing no signs of distress and noted that he said he was feeling "good" today.

118.    This observation was impossible as Hector was beginning to die of sepsis.

119.    At 10:30 p.m., Defendant Barela's medical note indicated Hector had refused to have his vital signs taken.

120.    This was impossible as the pain and suffering Hector was enduring made him incapable of refusing medical treatment.

121.    At 11:08 p.m., Defendant Barela noted that Hector was not in distress and that he did not want his vital signs to be taken.

122.    This was also impossible as eight minutes later at 11:16 p.m., video evidence demonstrates Hector collapsed for a third time and was being dragged out of his solitary cell by security staff.

123.    At 11:38 p.m., medical notes indicate Hector's blood pressure had dropped to 90/60.

124.    Medical records also indicate that Hector's hands were cold to the touch and that the pulse oximeter could not obtain a reading.

125.     The enormous drop in blood pressure from the previous reading, coupled with symptoms of cold extremities, distended abdomen, excruciating pain, and blood in the vomit, indicated Hector was dying.

126.     Any trained medical professional would know to call 911 under these circumstances.

127.     The defendants in this case each knew they should call 911 under these circumstances.

128.     Any rational human being, even without any medical training would know to call 911 under these circumstances.

129.     No defendant called 911.

130.     At 11:40 p.m., Defendant Eddie Berumen, a nurse practitioner, was called and informed of the situation.

131.     Defendant Berumen was familiar with Hector and his medical history from previous stays in the jail.

132.     Defendant Berumen made no attempt to provide for a higher level of care for Hector, but instead instructed medical staff to provide him with IV fluids.

133.     Medical staff claim they could not get a saline drip connected to Hector's arm.

134.     This meant they could not provide any treatment intravenously.

135.     Paramedics are trained to place IV lines into difficult spots in a person who is too sick or whose veins are not capable of accepting a normal IV line.

136.     Defendant Berumen knew his staff did not provide an IV line to Hector.

137.     Defendant Berumen knew ambulance personnel could obtain an IV line while on route to the hospital.

138.     Instead of ordering an ambulance, or arranging for someone capable of providing an IV, Defendant Berumen ordered staff to give Hector fluids to drink.

139.     At 12:07 a.m. on August 6, 2019, video evidence shows Hector collapsed for a fourth time.

140.     Custody staff attempted to escort him back to his isolation cell, but he fell to the floor.

141.     Hector was so sick he was incapable of keeping his pants up.

142.     Video evidence shows Hector's pants fell to the ground as he tried to remain standing.

143.     Defendant Barela again noted that Hector had "coffee ground emesis," an indication of blood in Hector's vomit.

144.     Defendant Berumen was again told that Hector was vomiting blood.

145.     At 1:00 a.m., Defendant Berumen finally ordered Hector be taken to the hospital.

146.     Ambulance rides cost the jail money.

147.     Defendant Berumen instructed staff not to use an ambulance but to use a security van to transport Hector to the hospital.

148.     This resulted in a 30-minute delay while security staff arranged a transport.

149.     During this time, without IV fluids or any meaningful treatment, Hector's time on this planet was drawing to an end.

150.     By all reasonable calculations, the travel time during normal business hours from the jail to the hospital is 15 minutes.

151.     An ambulance ride at 1 a.m. should logically be faster than 15 minutes.

152.     Defendants Macias and Ramirez took more than 30 minutes to leave the jail and another 30 minutes to make the short drive to the hospital.

153.     At some point during that 30-minute ride, while alone and shackled in the back of a security van, Hector suffered a cardiac arrest.

154.     Hospital staff were able to resuscitate Hector, but after having suffered a heart attack, Hector was in no condition for surgery.

155.     By failing to treat Hector's serious and obvious medical condition, Defendants deprived Hector of the ability to have lifesaving surgery.

156.     By choosing to use a security vehicle instead of an ambulance, Defendant Berumen deliberately delayed Hector's ability to receive lifesaving treatment.

157.     All Defendants allowed Hector to needlessly suffer 10 out of 10 pain for an unacceptable period of time.

158.     Hector was declared dead on August 7, 2019.

159.     When jail staff knew Hector was likely to die, they took great effort to organize his release from DACDC custody.

160.     This ensured Hector's death was not considered a death in custody and therefore did not require an investigation.

### COUNT I: VIOLATION OF DUE PROCESS
### INADEQUATE MEDICAL CARE
### (All Defendants)

161.     Plaintiff restates all previous allegations as if restated herein.

162.     Hector was sentenced to six days in jail and was therefore subject to the protections of the Eighth Amendment to the United States Constitution.

163.     The Eighth Amendment requires Defendants to provide adequate medical care to those in their custody.

164.     Hector was incapable of calling 911 for himself while serving his six-day sentence at the jail.

165.     Hector was forced to rely on each of the individual defendants to provide him access to a hospital.

166.     Hector was forced to rely on each of the individual defendants to provide treatment for his pain which he repeatedly described as 10 out of 10.

**Defendant Salazar was Deliberately Indifferent.**

167.     Defendant Salazar, a registered nurse, knew Hector had collapsed in pain on August 4, 2019.

168.     Defendant Salazar knew Hector had not eaten in at least 4 days.

169.     Defendant Salazar knew Hector was "dry heaving."

170.     Hector asked Defendant Salazar for medical care.

171.     Hector asked to be housed in the medical department.

172.     Defendant Salazar had an obligation to call for a higher-level practitioner to evaluate Hector.

173.     Hector's symptoms were clear indications of a serious and obvious medical condition.

174.     Defendant Salazar acted with deliberate indifference to this medical condition when she refused Hector's request for medical care.

175.     In an act of complete indifference, Defendant Salazar told Hector to return to his pod without medical care.

176.     Had Hector received access to adequate medical care, his pain and symptomatic, perforated ulcer would have been treated and he more than likely would have been alive today.

**Defendant Bennett was Deliberately Indifferent**

177.     As a Charge Nurse, Defendant Bennett knew she had an obligation to check Hector's medical chart when she provided him with treatment.

178.     Defendant Bennett saw Hector writhing in pain on the floor of the pod on August 5, 2019.

179.     Hector's medical chart described how he had collapsed the previous day with untreated abdominal pain.

180.     Defendant Bennett knew Hector was suffering pain on a scale of 10 out of 10.

181.     Defendant Bennett knew Hector was suffering high blood pressure and had a thready pulse.

182.     Defendant Bennett knew Hector had not eaten or had a bowel movement in 4 days.

183.     Defendant Bennett knew Hector had been vomiting and had been complaining of intense liver pain.

184.     Defendant Bennett had an obligation to call for an ambulance for Hector on the morning of August 5, 2019.

185.     Later that day, Defendant Bennett also learned that Hector had been vomiting blood.

186.     At this time, Defendant Bennett was aware that Hector's diagnosis of constipation made absolutely no sense.

187.    When Defendant Bennett learned Hector was vomiting blood, she had an obligation to arrange for an ambulance.

188.    In an act of deliberate indifference, Defendant Bennett did nothing in response to the news that Hector was vomiting blood.

189.    Had Defendant Bennett called an ambulance, it is more than likely that Hector would be alive today.

**Defendant Hernandez was Deliberately Indifferent**

190.    On the afternoon of August 5, 2019, Defendant Hernandez, a registered nurse, knew Hector was vomiting a brown, bile-like liquid consistent with bloody emesis.

191.    Defendant Hernandez knew Hector had a distended abdomen consistent with a perforated ulcer.

192.    Defendant Hernandez knew Hector was suffering from extreme sharp pain that radiated from the right side of his abdomen.

193.    Defendant Hernandez knew these symptoms were not consistent with Hector's diagnosis of constipation.

194.    Defendant Hernandez knew Hector had collapsed twice within the last 24 hours.

195.    With this knowledge, Defendant Hernandez had an obligation to call for an ambulance.

196.    In an act of deliberate indifference, Defendant Hernandez allowed Hector's pain to go untreated.

197.    Had Defendant Hernandez arranged for a higher level of medical care, Hector more than likely would not have died.

**Defendant Barela was Deliberately Indifferent**

198.     Defendant Barela was given the task of monitoring Hector's medical condition.

199.     Defendant Barela could see from Hector's chart that he was in serious pain, had been vomiting blood, had a distended abdomen and had collapsed on two previous occasions.

200.     Defendant Barela was meant to monitor Hector's condition and vital signs periodically throughout the night.

201.     Rather than monitoring Hector's deteriorating medical state, Defendant Barela claimed that Hector was refusing her care.

202.     Hector was dying of sepsis as a result of an untreated perforated ulcer.

203.     Hector was not capable of voluntarily refusing care.

204.     In an act of complete indifference, Defendant Barela described Hector as showing no signs of distress.

205.     In an act of complete indifference, Defendant Barela claimed she had spoken to Hector and had been informed he was feeling "good" that day.

206.     It would not have been possible for Hector, who was dying and critically ill, to convince anyone he was feeling good.

207.     It was not possible for anyone who had made a legitimate effort to check Hector's vital signs to believe he was showing no signs of distress.

208.     At approximately 11:16 p.m., Defendant Brian Valle heard grunting noises coming from Hector's isolation cell.

209.     Defendant Valle asked Defendant Barela if she wanted him to open the door so he could be examined.

210.     Defendant Barela said no.

211.     At this time, Officer Isaiah Montanez saw Hector's eyes roll up.

212.     Officer Montanez saw Hector lose consciousness and fall, smacking his head on the floor.

213.     Custody staff asked Defendant Barela if an emergency should be called.

214.      Defendant Barela instructed staff NOT to call code Mary, the jail's protocol for a medical emergency.

215.     The injury to Hector's head was visible and documented in his autopsy.

216.     Defendant Barela made no attempt to examine or document the injury to Hector's head.

217.     At approximately 12:00 a.m., Defendant Barela ordered custody staff to take Hector back to his solitary cell.

218.     At 12:07 a.m., Hector collapsed for a fourth time.

219.     Defendant Barela was told by custody staff that Hector could not make it back to his cell even with two officers trying to hold him up.

220.     Hector can be seen on video incapable of holding his pants up.

221.     Defendant Barela took his blood pressure.

222.     Hector's blood pressure was dangerously low.

223.     Defendant Barela did nothing to treat Hector's serious and obvious medical condition.

224.     Defendant Barela did nothing to document or treat the head injury Hector received when he fell and hit his head.

225.     Defendant Barela waited until 1:00 a.m. before calling the nurse practitioner on duty.

226.     Had Defendant Barela called for an ambulance, or arranged for a higher level of care, Hector more than likely would have lived.

**<u>Defendants Garcia and Berumen were Deliberately Indifferent</u>**

227.     Defendants Garcia and Berumen are nurse practitioners.

228.     Defendants Garcia and Berumen have a higher level of medical training than the other medical defendants involved in Hector's care.

229.     Initially, Hector was Defendant Garcia's patient.

230.     After Defendant Garcia went home for the evening on August 5, 2019, Defendant Berumen took over Hector's care.

231.     Before providing treatment to Hector, Defendants Garcia and Berumen had an obligation to review their patient's history and medical chart.

232.     At 11:15 a.m., when Defendant Garcia examined Hector, it was clear he was suffering from a potentially life-threatening condition.

233.     Defendant Garcia knew Hector was in agony.

234.     Defendant Garcia did nothing to treat his pain.

235.     Defendant Garcia knew Hector had collapsed on two prior occasions.

236.     Defendant Garcia knew Hector's pain emanated from his abdomen.

237.     Defendant Garcia knew that Hector had not eaten or defecated in 4 days and that his GI system had potentially shut down.

238.     As a nurse practitioner, Defendant Garcia knew these symptoms were consistent with a perforated ulcer.

239.     As a nurse practitioner, Defendant Garcia knew a perforated ulcer is potentially fatal if left untreated.

240.     Defendant Garcia diagnosed Hector with constipation.

241.     Defendant Garcia knew constipation does not cause the type of pain Hector was suffering and does not cause people to have extremely high blood pressure, a thready pulse, or cause them to collapse.

242.     Under these circumstances, Defendant Garcia's five-minute examination, coupled with a diagnosis of constipation, constitutes deliberate indifference to a serious and obvious medical need.

243.     Defendants Bennett and Hernandez had an obligation to inform Defendant Garcia that their patient's situation had deteriorated, that his abdomen was distended, and that there was evidence of blood in his vomit.

244.     Assuming Defendants Bennett and Hernandez complied with their obligation, in a further act of indifference, Defendant Garcia went home for the day and did not arrange for a higher level of care for her patient.

245.     Later that evening on August 5, 2019, after Hector's condition had worsened even further, Defendant Berumen became involved in his care.

246.     Defendant Berumen had an obligation to investigate this diagnosis of constipation rather than rely on it as being accurate.

247.     Defendant Berumen knew Hector's situation had become severe enough to merit an IV line.

248.     Defendant Berumen was told the IV line could not be accomplished in the limited setting of the jail medical department.

249.     In an act of indifference, instead of obtaining an IV drip for his patient, Defendant Berumen elected to rely on providing Hector glasses of water to drink.

250.     In an act of indifference Defendant Berumen provided no treatment for Hector's pain that had been at a level of 10 out of 10 for some considerable time.

251.     In an act of indifference, Defendant Berumen provided no treatment for the fact that Hector's blood pressure had dropped from 160/95 to 90/60 while his stomach became distended, and his hands and fingers became cold to the touch.

252.     Defendants Garcia and Berumen both knew these symptoms could result in death if untreated.

253.     Upon information and belief, Defendants Garcia and Berumen took the unacceptable and deliberately indifferent risk to treat Hector as if he was faking his serious symptomatology.

254.     As a result, Defendants Garcia and Berumen deprived Hector of life saving care that was available in the local hospital 15 minutes away.

255.     At 1:00 a.m., Defendant Berumen decided emergency room treatment was needed for Hector.

256.     In an act of incredible indifference, Defendant Berumen stopped staff from calling 911 and ordered security staff to use the jail transport van to take Hector to the emergency room.

257.     This decision predictably resulted in a delay.

258.     It took 30 minutes for staff to get the security van ready.

259.     It took an additional 33 minutes for the transport van to make the 15-minute journey to the hospital.

260.     The decision to use a jail van rather than paramedics in an ambulance deprived Hector of life saving care.

261.     Paramedics could have administered an IV and monitored Hector's heart.

262.     Without paramedics, Hector was forced to suffer alone while shackled in a prisoner transport van.

263.     Hector's pain and suffering became so extreme he collapsed in the back of the van having suffered a cardiac arrest alone and untreated.

264.     Until this moment, Hector's death could have been averted if emergency personnel were summoned.

**Defendants Macias, Ramirez and Valle were Deliberately Indifferent**

265.     Defendants Mario Macias, Dayman Ramirez, and Brian Valle were jail guards who knew Hector was suffering from a serious medical condition.

266.     Hector's symptoms were sufficiently obvious to alert every defendant that he was suffering a serious medical emergency.

267.     Custody officers have a duty to ensure detainees have access to adequate medical care.

268.     When Defendant Barela refused Defendant Valle's offer to open Hector's cell door when he was dying of a perforated ulcer, Defendant Valle had an obligation to call 911.

269.     When Defendant Valle saw that Hector had lost consciousness and struck his head on the floor, he had an obligation to call for a higher level of care than Defendant Barela was providing.

270.     Defendant Valle saw that Defendant Barela did not obtain vital signs from Hector.

271.     Defendant Valle saw Defendant Barela ignore Hector's potentially serious head injury.

272.     Defendant Valle saw Defendant Barela providing no substantive medical care for Hector who looked like he was near his death (as demonstrated by video evidence of the incident).

273.     Defendant Valle acted with indifference to a serious and obvious medical condition when he allowed Defendant Barela to convince him to ignore his training and fail to call for emergency help.

274.     Rather than call 911, Defendant Valle called for a bio crew to clean Hector's bloody vomit from the cell floor.

275.     At 1:00 a.m., Defendants Macias and Ramirez were instructed to take Hector to the emergency room.

276.     It took over 30 minutes before Defendants Macias and Ramirez set out to the hospital.

277.     This trip should only take 15 minutes during daytime traffic.

278.     At 1:00 a.m., the trip can be much quicker.

279.     Rather than hurry to the hospital, Defendants Macias and Ramirez took more than 30 minutes to reach their destination.

280.     Defendant Ramirez had seen how sick Hector was before he set out to the hospital.

281.     Defendants Macias and Ramirez acted with indifference to Hector's serious medical needs when it took them more than an hour to reach the hospital from the moment Defendant Berumen ordered a security transport.

282.     Such conduct amounts to deliberate indifference of a serious and obvious medical need.

283.     This indifferent behavior caused a delay in treatment that cost Hector his life.

### COUNT II: NEGLIGENT PROVISION OF MEDICAL CARE
### (Defendants Corizon and Corizon Staff ("Medical Defendants")

284.     Plaintiff restates each of the preceding allegations as if fully stated herein.

285.     Defendant Corizon was contracted to provide medical care to inmates housed at DACDC at all material times herein.

286.     The medical defendants, including Corizon, Salazar, Bennett, Garcia, Hernandez, Barela and Berumen, had a duty to provide Hector with adequate medical care.

287.     It was clear to all medical defendants that Hector was suffering from intense pain and discomfort.

288.     It was clear to all medical defendants that vomiting blood while experiencing extreme pain and collapsing on multiple occasions merits emergency medical care.

289.     It was clear to all medical defendants that a diagnosis of constipation did not sufficiently explain Hector's obviously serious symptomatology.

290.     It was clear to all medical defendants that a diagnosis of drug withdrawal did not explain all of Hector's obviously serious symptomatology.

291.     It was clear to all medical defendants that Hector's symptoms required a higher level of care than he was being provided.

292.     The standard of medical care imposed a duty on each medical defendant involved in Hector's care to obtain a higher level of care than he was receiving.

293.     By failing to arrange for life saving care, each medical defendant breached the standard of care of their respective profession.

294.     The facts described throughout this complaint demonstrate each medical defendant was at a minimum negligent in the medical care they provided or failed to provide.

295.     This beach in the standard of care was the proximate cause of Hector's death.

296.     This breach in the standard of care caused Hector to lose the opportunity of life saving surgery.

297.     Defendant Corizon is liable for the negligence of its employees under the theory of respondeat superior.

## COUNT IV: CUSTOM AND POLICY OF
## VIOLATING CONSTITUTIONAL RIGHTS
### (Defendants Board and Warden Vince Pokluda)

298.     Plaintiff restates each of the preceding allegations as if fully stated herein.

299.     Defendant Board, through their final policy maker Pokluda in his official capacity, created a policy to rely on Corizon staff for medical emergencies.

300.     This policy required custody staff to defer all decisions regarding emergency medical transport to Corizon employees or their contractors.

301.     This policy prevents custody officers from calling 911 unless Corizon staff instruct them to do so.

302.     This policy has resulted in numerous examples of people who have not been transported to the emergency room in a timely way.

303.     This policy is articulated in legal pleadings filed by Defendant Board in another civil rights case in which they are a defendant.

304.    Specifically, DACDC Detention Officer Enrique Perez wrote an affidavit describing this policy in a case where an inmate alleged he was not transported to the emergency room in a timely manner.

305.    Additionally, DACDC Sergeant Montelongo described this policy in an affidavit.

306.    Sergeant Montelongo testified that Corizon staff determine when an inmate goes to the hospital.

307.    Officer Enrique Perez testified that only after Corizon staff decide emergency treatment is necessary will custody staff summon 911.

308.    Detention staff have a constitutional obligation to summon 911 when they see a need for immediate emergency medical care which cannot be treated in the jail.

309.    Detention staff have a constitutional obligation to summon additional medical care if an inmate is receiving inadequate care for a serious and obvious medical condition.

310.    This obligation exists even if Corizon staff decide not to call for additional help.

311.    A policy existed at DACDC that discouraged detention staff from summoning emergency medical care unless Corizon staff authorized it.

312.    It is obvious such a policy would lead to delays in emergency medical care to inmates at DACDC.

313.    This policy has led to the deaths of several inmates in DACDC.

314.    Defendant Pokluda has encouraged and ratified this policy, even knowing it delays the summoning of emergency services via 911.

315.    This policy was the moving force behind the constitutionally inadequate care Hector received.

316.    Had this policy not existed, 911 would have been summoned to the jail in time to save Hector's life.

317.    Had such a policy not existed, 911 would have been called to take Hector to the hospital, rather than using a custody transport as ordered by Corizon staff.

318.    Detention staff witnessed Hector's eyes roll and saw him fall to the floor causing an injury to his head.

319.    Detention staff watched Corizon staff fail to treat this head injury.

320.    Detention staff repeatedly watched Corizon staff fail to treat Hector's life-threatening symptoms.

321.    Detention staff had an obligation to call 911 under these circumstances.

322.    Detention staff acted in accordance with DACDC policy and relied entirely on Corizon staff to summon emergency care.

323.    Corizon staff never summoned emergency care.

324.    This resulted in Hector's continued pain and suffering.

325.    This resulted in Hector's death.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all counts.

WHEREFORE, Plaintiffs requests judgment as follows:

1.  Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for attorney's fees and emotional harm.

2.  Punitive damages in an as yet undetermined amount severally against the individually named Defendants.

3.  Reasonable costs and attorney's fees incurred in bringing this action.

4.   Such other and further relief as the Court deems just and proper.


Respectfully submitted,

COYTE LAW, P.C.

 /s/ Matthew E. Coyte
Matthew E. Coyte
Alyssa D. Quijano
3800 Osuna Road NE, Suite 2
Albuquerque, NM 87109
(505) 244-3030
mcoyte@me.com
*Attorneys for Plaintiff*