1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF NEW MEXICO

3    HECTOR GARCIA, JR.,
     Personal Representative to the   Case No. 2:21-cv-00485-DHU-GJF
4    Estate of Hector Garcia
     estate of Hector Garcia,
5                                      Albuquerque, New Mexico
                    Plaintiff,         December 15, 2022
6                                      9:30 a.m.
     v.
7
     BOARD OF COUNTY COMMISSIONERS
8    FOR THE COUNTY OF DONA ANA, et
     al,
9
                    Defendants.
10

11                  TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE GREGORY J. FOURATT
12                 UNITED STATES MAGISTRATE JUDGE

13   APPEARANCES:
     For the Plaintiff:             Matthew Coyte, Esq.
14                                  Coyte Law, PC
                                    Suite 2
15                                  3800 Osuna Rd NE
                                    Albuquerque, NM 87109
16
     For the Defendants:            Henry John Paoli, Esq.
17   (Corizon Health, Inc.,         Scott Hulse, P.C.
     Christi Bennett, Melissa       P.O. Box 99123
18   Garcia, Gladys Hernandez,      El Paso, TX 79999-9123
     Heather Barela, Eduardo
19   Berumen)

20   Court Recorder:               Unknown

21   Transcription Service:        Chris Hwang
                                   Abba Reporting
22                                 PO Box 223282
                                   Chantilly, Virginia  20153
23                                 (518) 302-6772

24   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
25

1          (Call to order at 9:30 a.m.)

2               MR. COYTE:  Good morning or good afternoon.  I'm

3     actually all actually going to in a time zone.  So it's evening

4     where I am.

5               THE COURT:  Tell us where you are?

6               MR. COYTE:  I've gone back to England to visit my

7     family for Christmas.  So I'm actually in a little village in

8     the Cotswolds, praying the Internet holds out for as long as we

9     go.

10              THE COURT:  Well, we hope that it does.  What time is

11    it there?

12              MR. COYTE:  It's 5:00 or 4:30.

13              THE COURT:  Okay.

14              MR. COYTE:  4:30.

15              THE COURT:  All right, am I interrupting tea?

16              MR. COYTE:  Yes, they're downstairs having tea as we

17    speak.  So yeah.

18              THE COURT:  Mr. Paoli, good morning to you.

19              MR. PAOLI:  Good morning, Judge.

20              THE COURT:  Did I pronounce your last name the way

21    that you do?

22              MR. PAOLI:  Yes, you did.  Thank you.

23              THE COURT:  Okay.  Guys, we are officially on the

24    record in the Estate of Hector Garcia, Senior represented by

25    his son against Corizon Health, Incorporated and others.  It's

1    21 Civil 485.

2            And today, we're going to have oral argument on the

3    Plaintiff's motion to compel.  I appreciate the briefing.  I've

4    read it.  I've read it every exhibit and for one of the few

5    times I've actually read every case that the parties have cited

6    because I think I needed that education, but I still have a lot

7    of questions.  And you're about to find that out.

8            And one of the reasons why I do this by Zoom is so

9    that you can see this signal.  When I do this, all I want you

10   to do is stop talking because you have answered my question and

11   I'm ready to ask another one.  I promise I'm not accusing you

12   of filibustering, but you've done what I needed to and it's

13   time to move on.

14           I don't exactly know how long our conversation today

15   will take.  We sent you an email yesterday just in case it

16   expands beyond the one hour.

17           If at any time you need a break, either for comfort

18   purposes or otherwise, let me know.  This is a pretty flexible

19   hearing this morning.

20           So, Mr. Paoli, it's not your motion.  But it is your

21   burden.  And I wanted to start by questioning you today.  You

22   got any objection to that?

23           MR. PAOLI:  Not at all, Your Honor.

24           THE COURT:  So let me clear away some underbrush

25   first.  In response to my order on Monday, on Tuesday morning,

1    you sent to chambers for in camera inspection a single

2    document.  And without disclosing the contents of this

3    document, I will state for the record that it is five pages

4    long.

5           Is this the only document that the Defendants have

6    withheld under the privilege that I'm going to just refer to as

7    PSQIA?

8           MR. PAOLI:  That's correct, Your Honor.

9           THE COURT:  The reason I'm asking is Ms. Mooningham's

10   (phonetic) declaration at paragraph 16 says a little more than

11   that.  And I wanted to make sure that you and I have the same

12   understanding that she does.  So do you have access to her

13   declaration?

14          MR. PAOLI:  Yes.

15          THE COURT:  So her declaration says the patient

16   safety document -- and is what you sent me what she's

17   describing as the patient safety document?

18          MR. PAOLI:  That's right, Your Honor.

19          THE COURT:  Okay, she says so the patient safety

20   document describes in paragraph 15 and all other documentation

21   relating to it, what does she mean?

22          MR. PAOLI:  So Your Honor, how it was described was

23   we have the summary that I identified in the privilege log as

24   the people who specifically generated that.  And then, there

25   was the attachment to that particular summary.

1          And so, you have you'll note in the privilege log

2     we've got the author identified and I think there's two names

3     identified.  It's Ms. Newell, N-E-W-E-L-L and then Mr. Berumen.

4          And then, the attachment therein comes from another

5     lady named Ms. Boorsman (phonetic), but it's all basically part

6     of that one same document.  And that's the reference to the

7     documentation relating to the actual patient safety report

8     that's at issue here.

9          THE COURT:  Okay, all right.  But the document that

10    you sent me is all that you've withheld and it's really all

11    that Ms. Mooningham is referring to?

12         MR. PAOLI:  That's correct.  I'm not aware of any

13    other document that she is referring to or that's at issue for

14    purposes of this motion.

15         THE COURT:  Okay.  And your position is

16    straightforward.  Your position is is that 100 percent of this

17    document is protected by the privilege?

18         MR. PAOLI:  That's correct, Your Honor.

19         THE COURT:  You haven't said that, you know, some

20    portions of it may be disclosable, but other portions of it are

21    protected.  Your position is all of it is protected?

22         MR. PAOLI:  That's right, Your Honor.  Now I realize

23    the Court is going to have to kind of parse through it.  And

24    we'll have to make some determination with respect to portions

25    of it because it's more than one page, certainly, and I

1   understand that.  But it's our position that all of it was

2   generated for purposes of the PSQIA privilege.

3            THE COURT:  Okay.  So how long have you been

4   representing Corizon?

5            MR. PAOLI:  Approximately, Judge, 12 to 13 years.

6   Maybe it may actually go up to 15 years, Your Honor.

7            THE COURT:  Okay.  When did, if you know, when did

8   Corizon begin to provide the health care service at the Dona

9   Ana County Detention Center?

10           MR. COYTE:  I'm not sure, Your Honor the initial

11  contract, but I want to say approximately 2007.  It may -- I

12  believe it was before 2010 was the initial contract.  And then,

13  there's been a series of renewals afterward.  And I want to say

14  my best estimation it was before 2010.

15           THE COURT:  Okay.  And I'm really going to stretch

16  your memory here, but this is -- I'm building to a point and

17  you're educating me.

18           Has Corizon provided whether it's through a single

19  contract or a series of contract renewals health care services

20  at Dona Ana County since it began?  We'll say it's 2007, since

21  that time?

22           MR. PAOLI:  Yes, Your Honor, there was the initial

23  contract award and a series of renewals.  And there has been no

24  intervening contractor to provide medical care to inmates since

25  the initial award of the contract.

1          THE COURT:  Okay, that was better.  The answer was

2    better stated than my question.  So far as you can remember,

3    did Corizon have an -- a contractual obligation to the county

4    to conduct a mortality review after every in custody death

5    dating back to 2007?

6          MR. PAOLI:  Judge, I'm not prepared to say that

7    specifically only because prior to today and I apologize I

8    didn't review the language of every single contract and all the

9    language of the renewals.

10          My understanding is that there has not been

11    substantive changes with respect to the contract because it was

12    an initial contract award.  And then, the renewals were

13    essentially a one to two page renewal.

14          THE COURT:  Okay.

15          MR. PAOLI:  But I'm not aware specifically of every

16    single contract term and I don't want it make that

17    representation.  I just don't know.

18          THE COURT:  All right.  The third-party peer review

19    contract with the Missouri outfit, the version of that that I

20    have in this record dates back to I think it's October of 2015.

21    Was that the first time Corizon engaged that service with

22    respect to Dona Ana County Detention Center or on a broader

23    scale?

24          MR. PAOLI:  Yes, Your Honor, that is my

25    understanding.  I'm not aware of any other patient safety

1  organizational contract that my client has.

2       THE COURT:  Okay, so one thing I don't know because

3  it's not in the record is what does the sentinel event policy,

4  this is Exhibit 6 to the Plaintiff's motion, Corizon has an

5  internal policy in which it declares that deaths are reviewed

6  in accordance with the Corizon Health sentinel event policy.

7       Mr. Paoli, have you seen that policy?

8       MR. PAOLI:  Yes, I have Your Honor.  I believe that's

9  the one that's at issue or if unless I'm misunderstanding, I

10  think that's the one referenced in Plaintiff's particular

11  motion, the exhibit.

12       THE COURT:  Did you disclose -- did you or did

13  Corizon disclose the policy to the Plaintiffs in this case?

14       MR. PAOLI:  I believe so, Your Honor.  Plaintiff is

15  has asked for the policy and procedure manual.  I'm not aware

16  of one that has been withheld back for any reason.

17       THE COURT:  Okay.  How long is that policy?

18       MR. PAOLI:  It's a policy and procedure manual, Your

19  Honor.  It's approximately 90 to 100 pages is my best memory.

20       THE COURT:  Okay.  Does it have a -- okay, does it

21  have section in it that dictates what Corizon is supposed to do

22  when it conducts a mortality review?

23       MR. PAOLI:  In general terms, yes, Your Honor.

24       THE COURT:  Does it describe or prescribe a certain

25  report that needs to be generated?

1          MR. PAOLI:  Other than a general description of a

2    sentinel event report, I don't think it has a specific

3    definition or identification.

4          THE COURT:  Do you know how long Corizon has had this

5    sentinel event policy?

6          MR. PAOLI:  Not specifically, Your Honor.  I am aware

7    in general terms that the policy has been in place for some

8    time, but I could not tell you with any certainty when it was

9    added to the policy, whether it was since I had been working

10   with my particular client or not.  I just don't know.

11         THE COURT:  Okay.  And so, then you wouldn't know

12   whether the sentinel event policy pre-dates or post-dates the

13   contract with the Missouri third-party peer review company?

14         MR. PAOLI:  Not specifically, Your Honor.  Not at

15   this time, not without having had a chance to kind of through

16   that and review that.

17         THE COURT:  Okay.  I'm going to want to look at this

18   sentinel event policy.  So I don't care which of the two of you

19   sends it to me, but if one of you could send that to chambers

20   sometime let's say before the close of business tomorrow, that

21   would be helpful.

22         Mr. Paoli, in the last -- let's say the last -- since

23   the contract with the third-party peer review became effective,

24   how many in custody deaths have there been at Dona Ana County?

25         MR. PAOLI:  That I'm aware of, Your Honor?  So I

1    guess we're looking at from the 2015 onward?

2            THE COURT:  Yeah.

3            MR. PAOLI:  Oh, I knew of obviously this case.  Mr.

4    Coyte and I are counsel on a separate pending case that's

5    pending in another court.

6            I believe there was a prior case.  And then there was

7    one suicide case.  Well, there was one suicide that did not

8    turn into litigation so far as I know.  So I -- my best

9    estimate Your Honor, is five total.

10            THE COURT:  Okay.

11            MR. PAOLI:  That's -- keep in mind please understand

12    that's an estimate without me having had the chance to kind of

13    think through, well, a period from 2015 all the way to 2022.

14            THE COURT:  Let's turn to the excerpts from the

15    contract that Corizon has with Dona Ana County.  And I'm

16    referring to the excerpts that appear at Exhibits 3 and 4 of

17    the Plaintiff's motion.

18            And Mr. Paoli, I'm going to assume that these

19    excerpts are from the contract that governed the relationship

20    between Corizon and the county on the day that Mr. Garcia died.

21    Would that be a safe assumption?

22            MR. PAOLI:  Yes, Your Honor.

23            THE COURT:  Okay, so as Plaintiff argues and as I

24    read the contract, Corizon, there are two separate provisions

25    of the contract that dictate to Corizon that it must do

 1    something every time there's an in custody death.  The first of

 2    those made a decision the first of them I guess it is.

 3            Well, it's not the first of them.  I'm going in

 4    reverse order.  Paragraph 5.1.2.3 entitled "Mortality Review

 5    Process," the county orders the contractor to establish a

 6    mortality review process.  And I take it from the policy that

 7    Corizon does that by complying with its own sentinel event

 8    policy.  Yes?

 9            MR. COYTE:  Yes, Your Honor.

10            THE COURT:  Okay, this paragraph also says that that

11    if the county requests, the contractor has to participate in a

12    specific meeting that would have a specific agenda.  Do you

13    know if that happened here?

14            MR. PAOLI:  I do not, Your Honor.  I know and this is

15    I think partially relevant to the Court's consideration.  I

16    know Mr. Coyte has submitted on behalf of his client multiple

17    public -- inspection of public records requests to the county

18    to seek all documentation relating to Hector Garcia.

19            And incidentally, there was no such documentation

20    provided by the county in response to the HIPAA request.

21            THE COURT:  Yeah.

22            MR. PAOLI:  It leads me to believe that there was no

23    such documentation created at any type of meeting that may or

24    may not have occurred.  I don't even know if a meeting actually

25    occurred --

1              THE COURT:  Right.

2              MR. PAOLI:  -- specifically.

3              THE COURT:  Do you know whether Corizon complied with

4     its contractual obligation to conduct a -- well, you're going

5     to point me to this thing.  And what I'm asking about is the

6     obligation that Corizon had with the county to conduct a

7     mortality review.  Did the county do so?

8              MR. PAOLI:  Did the county do so, Your Honor?  I'm

9     not following the question.  I apologize.

10             THE COURT:  I'm sorry.  Did Corizon do so in this

11    case?

12             MR. PAOLI:  Yes, Your Honor, I believe so.  I believe

13    that's ultimately why we're here in large part to a degree.

14             THE COURT:  And what I'm trying to get at is how does

15    Corizon prove to the county that it complied with its contract

16    obligation to the county to conduct a mortality review?  Do

17    they produce something to the county?

18             MR. COYTE:  Yeah, Your Honor, that's a really

19    important issue and I'm glad you picked up on that that.  So

20    far as I know, and I think it's an established by Ms.

21    Mooningham's declaration, the actual mortality review, the

22    sentinel event review document is not produced to the county.

23             And specifically, paragraph 16 of her declaration

24    points out Corizon does not share that documentation with its

25    clients.

1    And of course here, the county is the actual client

2    that's involved here.  So while 5.1.2.3 contemplates the

3    obligation to actually do the review, that section does not

4    specify that the actual documentation that's created as part of

5    that review is actually going to be provided to the county.

6    And I think that's a substantial disagreement between

7    Plaintiff and Defendant with respect to what the scope of the

8    contractual obligation is because that's not done.  It's never

9    been done so far as I'm aware.  And I don't believe that the

10   county has the privilege -- or the documents that are claimed

11   to be privileged here.

12   It's -- they weren't provided as such unless the

13   Court concludes that somehow Ms. Mooningham is making some

14   false statement in her declaration.

15   THE COURT:  Well, I'm going to ask you in a minute or

16   several minutes exactly what treatment I'm supposed to give her

17   declaration.

18   But let's go to the other provision, which is 2. and

19   it's Plaintiff's Exhibit 4.  It's Section 2.0 or paragraph 2.0

20   of the contract between Corizon and the county.  And there, the

21   county is requiring Corizon to comply with among other things

22   the National Commission on Correctional Health Care Standards.

23   And in paragraph 5, Mr. Coyte has attached what those standards

24   are in the event of an inmate death.

25   You don't contest that that is what NCCHC says should

1   be done when an inmate dies?

2           MR. PAOLI:  No, Your Honor, you know, I don't know

3   that the exhibit per se is authenticated directly from NCCHC,

4   but I'm not aware of a specific statement from NCCHC that

5   differs from the exhibit that was tendered by the Plaintiff.

6           THE COURT:  Okay.  Your response didn't contest the

7   authenticity of this and it's a little unfair for us to do that

8   at oral argument because I suspect Mr. Coyte might have been

9   able to provide some additional assurance that this was

10  authentic had he known that was a concern.

11          As I read Exhibit 5, I can't help but conclude that

12  the NCCHC contemplates the production of a report.  You don't

13  disagree with that, do you?

14          MR. PAOLI:  The production of a report to whom, Your

15  Honor?

16          THE COURT:  Well, I'm not sure yet.

17          MR. PAOLI:  Okay.

18          THE COURT:  But the production of a report.  I mean,

19  we're -- they're telling us that this is done -- this should be

20  done in at least two phases.  And they tell us what should

21  occur in those phases and what the points or what the purposes

22  of the various phases are.

23          And I think it would be irrational for me to think

24  that that is done without the production of some kind of

25  report.  Yes?

1    MR. PAOLI:  Yes, Your Honor.  I understand that

2    point.

3    THE COURT:  Okay.  Give me just a second.  So Exhibit

4    6, the internal policy of Corizon, there's no suggestion at

5    least in this excerpt of the purpose for which the mortality

6    reviews are done.

7    I mean, whoever drafted this isn't saying for the

8    purpose of complying with third-party peer review or for the

9    purpose of complying with our, you know, with our detention

10   center client, for example, a county or a city.  There's no

11   reference in this exhibit to the privilege that you're

12   invoking.  Yes?

13   MR. PAOLI:  In that specific exhibit, I agree with

14   that, Your Honor.

15   THE COURT:  So -- and this may be a version of a

16   question I asked you already or a variation.  Do you know

17   whether this sentinel event policy preceded October of 2015?

18   MR. PAOLI:  Yes, I do, Your Honor.  And my belief and

19   understanding and I think I'll confirm this through all the

20   prior policy and procedures manual is it did precede the entry

21   into the contract with the Missouri Center for Patient Safety.

22   THE COURT:  Okay.

23   MR. PAOLI:  The policy and procedure manual has been

24   modified to a limited degree over the years since I have worked

25   with the client.

1        But in large part, I don't know of any specific

2   change to the specific Exhibit 6 language that you're referring

3   to between the pre-2015 period and the post-2015 period.

4        THE COURT:  So if Mr. Garcia's death had occurred

5   prior to the effective date of the contract with the Missouri

6   company, Corizon would be in a substantially different legal

7   position with respect to the federal privilege?

8        MR. PAOLI:  I agree, Your Honor.  And I would point

9   out to you that's one of the distinctions that I think is

10  critical in understanding why Tanner (phonetic) came out the

11  way it did.

12       Tanner has specific language on page 1224 in which

13  Judge Browning's decision notes that the underlying contract

14  with the patient safety organization, there wasn't proof that

15  it was actually in effect at the time the documents that that

16  were at issue.  So I don't view Tanner as a wholesale rejection

17  of the privilege.

18       THE COURT:  Yeah, I'm going to have some questions

19  about Tanner for Mr. Coyte.  So your position today, and I

20  didn't know this.  And there was no reason for it to come up in

21  the briefing.  Your position today is that so far as you're

22  aware, Corizon has never disclosed any mortality review report

23  to the county since October of 2015?

24       MR. PAOLI:  That's correct, Your Honor.  Post

25  contract with the Missouri Center for Patient Safety, I'm not

1   aware of any.  I've never seen any in connection with the cases

2   that I have personally handled on behalf of this client,

3   relating to Dona Ana County Detention Center.

4              THE COURT:  All right.  So I'm looking at this, the

5   document that you sent me.  And it's -- and I want to talk

6   about it in general terms so as to not to give away the store.

7              But on page 1, the top half of the page, and it's --

8   I mean, Mr. Coyte has briefed and complained that Mr. Berumen

9   should not be allow to invoke the privilege as he was sort of

10  directly involved in the health care decisions associated with

11  Mr. Garcia.

12             But I read this.  I've read it three times.  And Mr.

13  Paoli, to me, it is historical it's factual, it is

14  chronological.  And it does not contain anything that I would

15  consider evaluative or self-critical or dictating things that

16  we could have done better or corrective action plans.  Do you

17  agree?

18             MR. PAOLI:  I don't, Your Honor.  I don't.  And let

19  me just start articulate why.  In order for corrective action

20  to be taken, there has to be a summary of the incident that is

21  provided by someone with some knowledge.

22             Now I realize there was a dispute between the parties

23  as to whether that could be an individual provider involved

24  with the care or not, but as a preliminary matter, before we're

25  going to try to evaluate whether some type of correction action

1    can be done, the statute contemplates that you're going to

2    develop and disseminate certain times of information.

3         And I think the first part of that is the summary of

4    what happened even if the provider is not individually blaming

5    himself or herself and identifying specific room or items for

6    improvement.  So I don't 100 percent agree with the Court's

7    characterization on that issue.

8         THE COURT:  The overall document certainly has an

9    evaluative dimension to it.  I was just talking about -- I was

10   just talking about the history, the narrative piece that is the

11   first half of page 1.  Every single sentence seemed to me to be

12   relating to us history, something that happened.  You read it

13   differently?

14        MR. PAOLI:  No, Your Honor.

15        THE COURT:  I -- let me add.  I know why this was

16   created.  I mean, there wouldn't have -- there would be no way

17   to have a meaningful evaluation if we didn't have this going

18   first obviously.

19        But if this were by itself, the top half of page 1

20   were by itself, that seems to me to be nothing more than a

21   chronological, historical narrative of six days in time.

22        MR. PAOLI:  True, Your Honor, except I think the

23   distinction I'm making is that whether that actually makes a

24   difference under the PSQIA.

25        I don't believe it does because of the broad

1    definition of what patient safety activities means.

2          The definition itself both includes the critical

3    analysis portion, but it also includes the development and

4    dissemination of information with respect to improving patient

5    safety.

6          So I don't think the privilege can basically be cut

7    off nearly because you have the additional or excuse me the

8    initial historical perspective that is given by the person that

9    is initiating the process.  I think the definition of patient

10   safe activities is broader than that.

11         THE COURT:  Does the top half of page 1 of the

12   report, the patient safety report, does the top half appear in

13   any other medical record or document of any kind?

14         MR. PAOLI:  No, Your Honor.  Now obviously Mr. --

15   since Mr. Berumen was a provider, he has his own medical

16   records in Mr. Garcia's medical chart.  Those have been

17   produced.

18         So certain information that may have made its way

19   into the summary can be consistent with what is reported by Mr.

20   Berumen in his own medical record.  But that's -- in terms of

21   the specific language, the specific text, it is not contained

22   in the medical chart.

23         THE COURT:  Okay.  A large part of this legal dispute

24   turns on the definition of patient safety work product.  As we

25   find in either the guidance or I think it's more than guidance.

1    I think it's the HHS regulation.

2              But I'm looking at page 28 of 45 of your response.  I

3    think the same material is in the Plaintiff's motion, but I'm

4    looking at page 28 of 45 of your response.

5              And the relevant portion reads patient safety work

6    product does not including a patient's medical, record billing

7    and discharge information, or any other original patient or

8    provider information.

9              Do you know what is meant by the phrase original

10   patient or provider information?

11             MR. PAOLI:  Your Honor, I looked into that, didn't

12   find anything specifically by way of case law that summarized

13   or addressed that issue.

14             THE COURT:  Okay.  Continuing on, what is excluded

15   from the definition of PSWP is information that is collected,

16   maintained or developed separately, or exists separately from a

17   patient safety evaluation system.

18             So the Plaintiff's position is Corizon had a separate

19   contractual obligation to assemble all or some of what we see

20   in this patient safety report, a pre-existing free standing

21   independent obligation to do this.  And to that, Mr. Paoli, you

22   would say what?

23             MR. PAOLI:  That the characterization of the

24   obligation that's summarized by Plaintiff, yes, there was an

25   obligation imposed by the contract to do the review, but the

1    language cited by the Plaintiff has nothing to do with the

2    actual documents that are generated here.

3         So, for example, 5.1.2.3 contemplates a mortality

4    review committee meeting.  That's not what the privilege

5    documents or the documents that are claimed to be privileged at

6    issue here.

7         5.1.2.3 contemplates the potential consultation or

8    meeting with the county.  That's not what we're dealing with

9    here.

10        The specific documents at issue here were not

11   generated pursuant to the specific obligations imposed on my

12   client under the contract, or the NCCHC standards.

13        They were generated for an entirely different

14   purpose.  And that was the purpose of a specific patient safety

15   report that was going to be made to the Missouri Center for

16   Patient Safety.  So I think that's the critical distinction

17   that I believe is necessary to kind of analyzing this issue.

18        THE COURT:  How did Corizon comply with the NCCHC

19   standards in this case?

20        MR. PAOLI:  Not sure, Judge, because I don't have a

21   document that is separate and apart from the document that I

22   think is ultimately the subject of this particular dispute.  I

23   don't have a separate document for that.

24        THE COURT:  Okay.  So, far as you know, Mr. Paoli, is

25   -- did Corizon kill two birds with one stone by satisfying its

1  contractual obligation with the county to comply with NCCHC's

2  standards and satisfy its contractual obligation with the

3  Missouri outfit by the creation of the document you sent me?

4          MR. PAOLI:  I don't believe so, Your Honor.  That's

5  not my understanding.  And I don't think that's the intent of

6  the declaration in terms of what is specifically identified.

7          Ms. Mooningham says specifically in her affidavit the

8  sole purpose of these documents was for reporting to a patient

9  safety organization, not for any other purpose including

10  compliance with contract obligations or compliance with NCCHC

11  standards.

12          THE COURT:  So there's a gap then -- there's a gap in

13  my record.  Corizon has a contractual obligation to comply with

14  the NCCHC standards.

15          And those are fairly -- those are fairly intricate.

16  I mean, it contemplates the production of a fairly significant

17  informative educational report.

18          You're telling me you don't know whether that was

19  done and if so, what the work product was that was generated by

20  that process, yes?

21          MR. PAOLI:  That's true, Your Honor.  I don't know

22  whether that was done, whether there's a separate document to

23  that effect.

24          I don't -- I've never understood the document at

25  issue here is that document.

1        THE COURT:  So if it's Corizon's burden to

2    demonstrate that this privilege applies, doesn't Corizon carry

3    the evidentiary burden to show me that there are two separate

4    things and they are not the same?

5        MR. PAOLI:  Respectfully, Judge, I don't think the

6    burden goes that far.  And the reason for that is because

7    Plaintiff's argument is essentially is, well, you couldn't have

8    done it for multiple purposes.  There must have been some

9    disclosure with the county or you must have had an alternate

10   purpose.

11       But the only evidence that's been submitted to the

12   Court by way of Ms. Mooningham's declaration is that the

13   documents withheld on -- and claimed to be privileged at issue

14   here are generated for only pun purpose, the sole purpose.  She

15   specifically uses that word in her declaration.

16       And the sole purpose for creating these particular

17   documents is not some contractual obligation, not some

18   obligation with respect to NCCHC standards, but for purposes of

19   a specific reporting to the patient safety organization that's

20   at issue under the contract.

21       So, the fact that Plaintiff says, well, there's some

22   other purposes and you must assume that there's some other

23   purpose, when the -- that's basically Plaintiff's suspicion in

24   light of what the contract says and what the NCCHC standards

25   say, our response is but the only evidence that's actually been

1    submitted to the Court says that the sole purpose of these

2    documents at issue here was for a very specific purpose of

3    reporting to the patient safety organization.

4            THE COURT:  So the second half of page 1, and this

5    spills into obviously page 2, who is that person?

6            MR. PAOLI:  That is a person who is an internal

7    corporate office person who's not in Dona Ana County.  I

8    believe it's in the corporate office.

9            I believe Ms. Newell is a physician.  It's either a

10   physician or a nursing provider, but my understanding is that

11   is a physician.

12           THE COURT:  And is your understanding that her

13   narrative was in the nature of third-party peer review?

14           MR. PAOLI:  Well, in yes, Your Honor.  When you say

15   third-party, you threw me off an a little bit.  But in the

16   nature of peer reviewed done by Corizon personnel.

17           She is a Corizon personnel -- was at the time a

18   Corizon employee.  It wasn't an independent third party

19   separate from the company.

20           THE COURT:  I got you.  All right.  And so, this

21   entire document then would be sent to whoever the Missouri

22   outfit is.  Ms. Newell does not work for the Missouri outfit?

23           MR. PAOLI:  Correct, Your Honor.  She does not work

24   for the Missouri company.  She works -- she was at the time a

25   Corizon employee.

1          THE COURT:  I got you.  Not involved in any way with

2     the care given to or withheld from Mr. Garcia?

3          MR. PAOLI:  That's correct.  She was not a local

4     provider, was not doing any work in Dona Ana County.

5          THE COURT:  Okay.  If we go to page 3, there's a

6     prepared by name.  Is that person on site here at Dona Ana

7     County?

8          MR. PAOLI:  She was formally, Judge.  She was not

9     involved in Mr. Garcia's care but at the time, she's a former

10    employee now.  At the time, she was a director of nursing.

11         THE COURT:  Got you.  And that's what DON stands for

12    in this document?

13         MR. PAOLI:  Right.

14         THE COURT:  Okay.

15         MR. PAOLI:  Director of Nursing.

16         THE COURT:  All right, and HAS stands for Health

17    Services Administrator?

18         MR. PAOLI:  That's correct.

19         THE COURT:  Okay, all right.  So, Mr. Paoli, and

20    forgive me if I've already asked this question, but it's

21    important enough to ask it a second time.

22         So far as you're aware since the effective date of

23    the peer review contract with the Missouri outfit, has Dona Ana

24    County ever disclosed to the county or to anybody other than

25    the Missouri outfit mortality reviews or in custody deaths?

1          MR. PAOLI:  Absent a court order, Your Honor, I'm not

2    aware of any such disclosures.

3          THE COURT:  So now let me ask you about Ms.

4    Mooningham's declaration.  She's at Corizon corporate, yes?

5          MR. PAOLI:  Yes, Your Honor, not local.

6          THE COURT:  What deference or treatment or

7    credibility do I assign to a declaration in the questionnaire

8    question mark?

9          MR. PAOLI:  Well, Your Honor, in terms of Corizon

10   satisfying and providing evidentiary matters to the Court with

11   respect to satisfying its burden to establish the privilege, I

12   think the normal accepted procedure is that the declaration

13   should be properly considered by the Court with respect to what

14   is the sworn testimony being provided and does that sworn

15   testimony establish that the document at issue meets the

16   privilege requirements under the statute?

17         Hopefully, I answered that question.  Maybe I did

18   not, but I think that's kind of the -- there has to be some

19   deference to it because that's the evidence that ultimately has

20   to be submitted in order to evaluate the merits of the

21   privilege claim.

22         THE COURT:  And if it were controverted by a

23   competing declaration or some other evidence, then maybe we

24   would have had had an evidentiary hearing, but that didn't

25   happen here.  So such a hearing isn't necessary?  That's your

1    theory?

2            MR. PAOLI:  Yeah, that's right, Your Honor.  I mean,

3    ultimately, I think the declaration stands on its own.  I don't

4    think it's contradicted per se by any of the Plaintiff's

5    exhibits with respect to the specific matters that are

6    discussed in the affidavit, excuse me, the declaration.

7            THE COURT:  In a declaration that is this detailed,

8    that makes the representations that it does, was -- is of

9    qualitatively different kind that the one before Judge Browning

10   and Tanner?

11           MR. PAOLI:  I believe so, Your Honor.  I was

12   obviously not counsel in the Tanner case for the Defendant, but

13   I think it's substantially different.

14           And I would note that with respect to Tanner

15   specifically, the Court noted that the substantive matters

16   stated in the declaration that was presented in that case were

17   substantially different.

18           And in Tanner, the Court -- Judge Browning's decision

19   says if there was proof that the documents such as clinical

20   /KAL mortality reviews, patient safety, and error reporting

21   system, and quality improvement studies are among the documents

22   at which Tanner seeks to compel discovery, and to the extent

23   those documents are generated as part of correct cares patient

24   safety evaluation system, they are subject to the PSQIA

25   privileges protection.  And that's a direct quote from page

1    12424 of Judge Browning decision in Tanner.

2            So from the out said, part of the dispute I think

3    between myself and Mr. Coyte was that Tanner in my opinion does

4    not go as far as Mr. Coyte is suggesting as a categorical

5    rejection of the privilege.

6            It was just an evaluation about the evidence that was

7    actually presented to the Court and which Judge Browning had an

8    opportunity to evaluate.  I think it's substantially different.

9            THE COURT:  All right.  Did it -- did you have a

10   chance at any point in the discovery process either before or

11   after you disclosed the privilege log to let Mr. Coyte or his

12   co-counsel know generally how big or how long or how long many

13   pages the withheld patient safety report had?

14           MR. PAOLI:  Not in terms of the number of pages, Your

15   Honor.  I think the privilege log just identified the document

16   in general terms.  It didn't say how pages the document was.

17           THE COURT:  Okay, all right.  I mean, in some ways, I

18   you know, I feel for them because he's sort of punching at a

19   ghost, because he doesn't know -- he doesn't, you know, patient

20   safety report could be a lot of things.  And he doesn't know

21   whether there were any attachments to it.  He doesn't know

22   whether it was 5 pages or 500 pages.  I couldn't stand the

23   suspense any more.  That's why I had to order you to send to be

24   in camera.

25           Is there a reason why -- is there a reason why the

1   privilege log didn't say this is a five page document Bates

2   labeled such and such?

3        MR. PAOLI:  No, Your Honor.  I mean, I think the

4   standard form privilege log contemplates kind of generally

5   disclosure of author type of document they created and so

6   forth.

7        I've never understood previously that you're having

8   some specific identification of the number of pages.  I don't

9   know that it would necessarily make a difference under the

10  statute in terms of whether the privilege applies.

11       THE COURT:  Is the five-page document the only

12  submission that Corizon sent to the Missouri company?

13       MR. PAOLI:  I'm not aware of any others, Your Honor.

14       THE COURT:  Okay.

15       MR. PAOLI:  Otherwise we would have provided that to

16  you in response to the order.

17       THE COURT:  All right.  So the Missouri company gets

18  this.  It doesn't get the underlying medical records that are

19  summarized or from which the reader could make his or her own

20  conclusions?

21       MR. PAOLI:  I'm not aware of the actual transmission

22  of the medical chart to the patient safety organization.

23       THE COURT:  Okay.

24       MR. PAOLI:  I don't -- I've never understood that's

25  part of the process.

1          THE COURT:  So far as you're aware since Corizon has

2     begun this patient safety evaluation system process, certainly

3     by October of 2015, in how many cases whether state or federal

4     has Corizon taken the position that 100 percent of the

5     mortality review report is protected by the federal privilege?

6          MR. PAOLI:  Judge, I don't know that specifically

7     just because the client does business in multiple states.  I've

8     only handled cases relating to Dona Ana County Detention

9     Center.

10          I know of one case involving Corizon that's the

11     Crawford case cited I think in Plaintiff's reply or maybe

12     referenced in Tanner where Corizon was a named party and that

13     ultimately the Court ruled against it, but I just don't know

14     that off the of my head, Your Honor.

15          THE COURT:  I would suspect since Corizon is a

16     national company and this is a federal privilege, that Corizon

17     is trying to have a consistent approach for its -- all of its

18     facilities with respect to inmate deaths?

19          MR. PAOLI:  I believe that's probably the case, Your

20     Honor.  I know generally that there is a significant concern

21     about discovery requests that seek this specific type of

22     information and the extent of the privilege that is claimed by

23     the company.

24          I don't know, like I said, I can't comment on things

25     that happened outside of my scope in terms of beyond Dona Ana

1    County, but I think that's probably a fair assumption.

2         THE COURT:  And in your briefing, you referenced one

3    decision from a judge in Texas that was favorable to your legal

4    position, yes?

5         MR. PAOLI:  That's correct.  With respect to a

6    specific in custody death as opposed to some of the more

7    general cases that kind of deal with the same issue in the

8    context of hospitals and so forth.

9         THE COURT:  Yeah.  And do I understand that the same

10   judge in two other cases involving in custody deaths ruled the

11   other way?

12        MR. PAOLI:  I'm not aware of that specifically, Your

13   Honor.  I just didn't -- I wasn't aware of that.

14        THE COURT:  Okay.

15        MR. PAOLI:  I think the Luisa (phonetic) case that I

16   cited, I don't know that that specifically references other

17   decisions by that judge on a similar issue involving an in

18   custody death.

19        THE COURT:  Okay.  It seem that, and I don't blame

20   Corizon if this is in fact true, but it seems that its legal

21   position is becoming increasingly refined so as to take

22   advantage of the federal privilege and the improvements to

23   patient safety that it encourages.  Is that what Corizon is up

24   to?

25        MR. PAOLI:  No Your Honor, I don't think so.  I mean,

1    I think you know --

2              THE COURT:  That was a softball.

3              MR. PAOLI:  Okay.

4              THE COURT:  I mean, I was looking for a yes because

5    if I was the CEO of Corizon, that's exactly what I would be

6    doing.  I mean --

7              MR. PAOLI:  Yeah.

8              THE COURT:  -- absent the privilege, there's a

9    litigation reason not to engage in a whole bunch of reflection.

10   But with the protection of the privilege, there is -- there's a

11   refuge or a safety zone in which a health care provider can try

12   to get better.  And it seems to me that that Corizon is seeking

13   to make sure that it avails itself of the federal protection.

14             MR. PAOLI:  Yes, Your Honor and maybe I

15   misunderstood.  I was thinking along the lines of by entering

16   into the contract in 2015 with the Missouri Center, that's

17   certainly an indication that the company is seeking to avail

18   itself of the protection that may apply under the PSQIA.

19             Otherwise it wouldn't have been a reason to do that.

20   And obviously, my client had operations in multiple states

21   including in Dona Ana County prior to 2015.

22             THE COURT:  Okay, the -- this question is purely for

23   my curiosity.  But the statute dates back to, what is it '98?

24             MR. PAOLI:  Yeah, I believe so, Your Honor.  It did

25   pre-date I think some of the -- at least as far as I'm

1    concerned the contract that my client had with Dona Ana County.

2            THE COURT:  Okay.  And how long has Corizon been in

3    the business of providing health care services to the confined

4    community?

5            MR. PAOLI:  Quite a while, Your Honor.  There was a

6    previous lead the company was under a different name and called

7    Prison Health Services.  And it was involved in a correctional

8    health care for I want to say at least probably going back

9    until the 1990s.

10           THE COURT:  Yeah.

11           MR. PAOLI:  If not earlier.

12           THE COURT:  Right.

13           MR. PAOLI:  But that's I think that's an educated

14   guess on my part.

15           THE COURT:  Let me see if I have other questions for

16   you.  So Mr. Paoli right now, those were the questions that I

17   had for you.  Apart from our discussion today, and what you

18   briefed to me, are there any other points you want to emphasize

19   before I turn to Mr. Coyte?

20           MR. PAOLI:  No, Your Honor.  I appreciate the careful

21   consideration that you've given to me and I'll just stand by

22   and continue to listen to the questioning.

23           THE COURT:  Okay, Mr. Coyte, let's do this.  Let me

24   take about a two or three minute recess and then I'll join you.

25           MR. COYTE:  Okay.

1          THE COURT:  And if that gives you enough time to go

2     refill your cup of tea, you got my permission.

3          MR. COYTE:  All right, thank you.

4        (Brief recess)

5          THE COURT:  Okay, gentlemen, we're back on the

6     record.  So Mr. Coyte, did you learn anything during that

7     conversation?

8          MR. COYTE:  A fair amount I think, yes.

9          THE COURT:  Well, I did, too.  Your primary position

10    is that Corizon has an independent contractual obligation to

11    engage in a mortality review process.  And it cannot shield its

12    compliance with that contractual provision by complying with a

13    different contractual provision, yes?

14         MR. COYTE:  Yeah, the kills two birds with one stone

15    analogy is seems like, yeah, I mean, they -- they can't switch

16    from one obligation to another thereby insulate themselves from

17    discovery.

18         THE COURT:  We heard today that Corizon sends nothing

19    to the county.  That it complies with its contractual

20    obligation, but it sends no email, no document, of any kind to

21    the county.

22         And I'm just wondering what your reaction is to that?

23         MR. COYTE:  Well, I have two or three reactions to it

24    actually.  One is that the county could at any time if it was

25    doing its job properly ask for it.

1          I mean, that's what they ought to be doing.  Because

2     they're not doing it doesn't mean that you should then give

3     them a privilege.  The county should be doing it.  That's one.

4          Two, it also the other way looking at it is, well,

5     this privilege that we're talking about you can look at it in

6     two ways.

7          One, the very simple way, which is that they have an

8     obligation to create this independent of the privilege or the

9     complicated way, which is have they actually adhered to the

10    requirements to the federal privilege?

11         And in which case you can need discovery.  And I'd

12    have to start calling county witnesses.  And we'd have to start

13    finding when these documents were transferred.  It becomes a

14    mini trial on this issue.

15         It could be quite expensive.  I kind of wanted to

16    avoid that in the briefing.  The idea of an evidentiary hearing

17    on this subject could get pretty wide pretty quickly.

18         THE COURT:  Yeah, true.  But you know, this is --

19    even though we're only talking about a five-page document, I

20    think this is an important principle of law and it's probably,

21    you know, it's got some precedent setting qualities to it.

22         Did you serve and IPRA (phonetic) on the county for

23    whatever mortality review report was produced?

24         MR. COYTE:  I must confess I don't remember.

25    Whenever I do a case, I IPRA the county for all documents

1      associated with the death.  And frequently, I'd get partial

2      documents because some of them exist with private contractors

3      and the county doesn't have them and I may get those in

4      discovery.  Or I get the whole lot depending on who the

5      contractor is.  So there is -- it's hard to tell.

6              THE COURT:  Okay.  And once you learned -- I know you

7      were told early on in discovery that no mortality review had

8      been done.

9              Corizon then changed that to say that one was done,

10     but it was privileged.  Did you serve a new IPRA on the county

11     or did you rely on the original one?

12             MR. COYTE:  I believe I relied on the original one.

13     I wouldn't have thought to go get another copy of the same

14     thing.

15             THE COURT:  Yeah, okay.

16             MR. COYTE:  The --

17             THE COURT:  All right.

18             MR. COYTE:  I mean, I think I don't know if it -- in

19     your questioning earlier, of the policy that Corizon has and

20     whether where it pre-dated the privilege that the company that

21     they had hired, the policy on its face if you look at it I

22     think on the bottom of the page, which would be Exhibit 5, I

23     think is that no, not 5.

24             THE COURT:  6?

25             MR. COYTE:  Is it 6?  Yeah, 6.  At the bottom of page

1    it gives you the references for why they have the policy.

2              And it refers to the NCCHC standards and to the

3    American Correctional Association Standards, ACA.

4              So the reason the policy exists that they have to

5    create mortality review is not for the PSQIA. It is for the

6    standards, the standards that the county requires them to

7    uphold.

8              So if you take that logic further, they then hire a

9    company and send their review to them.  That would -- because

10   they haven't sent it to the county or not, it doesn't -- you

11   see what I'm saying?  And I think made the point.  It's it has

12   to happen regardless of PSQIA.

13             THE COURT:  I understand the point.  I'm going to go

14   back to the definition of what is not patient safety work

15   product.

16             And so, Mr. Coyte, excluded from that definition as I

17   read -- as I read earlier, is any information collected,

18   maintained, or developed separately, or that exists separately

19   from a patient safety evaluation system?

20             And I don't mean for this to be a semantic

21   distinction, but you're absolutely correct that Corizon has an

22   independent obligation to -- independent from the PSQIA to

23   collect and maintain and develop this information in

24   furtherance of its contractual obligation to conduct a

25   mortality review.

1          I worry whether this record shows that Corizon does

2     that.  It has an obligation to do it.  Does it do it separately

3     from what it puts together to send to the PSES as it were.

4     Help me with that?

5          MR. COYTE:  Well, so you -- I think your question is

6     saying that if they violate their own standards policies and

7     contract with the county, is this different to what they'd be

8     doing if they hadn't violated hose policies and contractual

9     obligations?

10         THE COURT:  The -- some -- that's a nice framing of

11    the question.  I'm interested in you answering your question.

12         MR. COYTE:  Yeah, okay, then what I would need to do

13    is do some discovery and find out when they do these things

14    with the county -- with the NCCHC, do they create these types

15    of documents?

16         You know, I wouldn't know until we get an evidentiary

17    hearing going.  And it would seem like, you know, I could argue

18    that, yes, because what else could it possibly look like?

19    Though I've never seen it, so I don't know.

20         I've got them in other cases where Judge Garza

21    (phonetic) recently ordered one -- over a lawyer objection, a

22    similar statutory provision.  I think the Tanner discusses in

23    January of this year.  We got a report.  And they're not much

24    of anything, these reports.

25         I mean, there's part might concern in doing these

1      cases they're not all that helpful for doing patient quality

2      review work, but I don't know in this example.  So I guess I'm

3      in the dark.  I need to start deposing people.

4             THE COURT:  And did any discovery take place about

5      this privilege before you filed your motion?

6             MR. COYTE:  No, I have no -- until I filed the

7      motion, I wouldn't have known the concept of what they are

8      talking about and how they're using it.  So I couldn't

9      anticipate what discovery would be required.

10            THE COURT:  So I have a blind spot and I -- as today

11     has played out, it seems to me that that three of us have a

12     blind spot.

13            And that is we don't know what if anything Corizon

14     does to comply with its contractual obligation with the county

15     to conduct a mortality review process and then to comply with

16     and frankly document its compliance with the NCCHC standards.

17            We don't know what that report would look like if

18     Corizon did it.  We certainly know, at least Mr. Paoli and I

19     know, what the report looks like that Corizon says is what they

20     put together to send to the Missouri company.

21            But I don't know this.  And my fear -- let me put

22     some cards on the table, my fear is that if these two things

23     are the same, or there's -- or there is substantial overlap

24     between the two, then Corizon, its legal position has gotten

25     shall we say less strong, but we have a blind spot.  And I'm

1    wondering, Mr. Coyte, what am I supposed to do about that blind

2    spot?

3            MR. COYTE:  Well, I would say that the statute itself

4    where it says if you are required to create the documents for

5    some other reason, the statute doesn't give you a privilege.

6            And it gets simpler in the plan language of the

7    statute.  So what could you possibly do that doesn't require

8    you to create similar documents if you would to follow NCCHC

9    standard, all the contractual standard of just the mortality

10   review.

11           THE COURT:  I don't know because I don't have the

12   benefit of your experience or the familiarity with the NCCHC

13   Standards besides Exhibit 5 to your motion, what they require.

14   And how that is different from what Corizon prepared for the

15   patient safety evaluation system.  I don't know.  And --

16           MR. COYTE:  Well, if I may, for a minute, suggest

17   that given the burden rests with them, that they would have had

18   an obligation to demonstrate that in their response brief.

19           THE COURT:  Your request for production demanded all

20   mortality reviews, yes?

21           MR. COYTE:  Yes.  Yeah, and other discovery

22   questions.  We should have got it.  If they did another one, we

23   would have had it.  I think Henry would agree with that.

24           THE COURT:  I'm looking at page 4 of your motion, the

25   bottom of page 4, where you either quote directly from or

1  summarize Interrogatory Number 23 and request for production

2  number 11.

3          MR. COYTE:  Yes.

4          THE COURT:  And those are certainly -- those would

5  certainly contemplate whatever mortality review Corizon did to

6  comply with its obligation to the county and whatever it did to

7  comply with its obligation to the Missouri outfit.

8          And the privilege log and today's discussion with Mr.

9  Paoli tells us there is a single document.  So I'm not sure --

10  I'm not exactly sure what a whole bunch of discovery would show

11  us beyond what we know.

12          MR. COYTE:  Well, yeah, I agree.  And I don't -- and

13  I -- Plaintiff does not want to get involved in additional

14  unnecessary discovery.

15          THE COURT:  I don't want you to do it either.

16          MR. COYTE:  But what we'll learn, I suspect, is that

17  if they complied with the NCCHC, they'd have a similar

18  document.

19          THE COURT:  How much help is receiving a copy of

20  Corizon's sentinel event policy going to be for me?

21          MR. COYTE:  I don't know, Your Honor.  I don't

22  recollect reading it.

23          THE COURT:  Okay.  You've been -- it's been disclosed

24  to you.  You haven't read it?

25          MR. COYTE:  Well, I probably read it a long time ago.

1    As I say, I suppose my -- and I apologize to the Court, but my

2    looking at the problem is one of -- I look at it much more

3    simply rather than -- well, there are two ways of looking at it

4    for me.

5            One is very simple.  That you -- doesn't matter if

6    they contracted away their report writing.  The report writing

7    is required for other reasons.  And the face of a statute says

8    that you can't do that.  It doesn't make it privileged if you

9    have to do it anyway.

10           The more complicated look at it is to go through as

11   the Tanner court did go through a bunch of witnesses and say,

12   well, when was it written?  Where did it go?  And what -- and

13   start, you know, really pulling apart the actual document.  I

14   don't think you have to get that way.  I don't think Tanner

15   court needed to.

16           But I don't think anybody else raised in other cases

17   the contractual and association standards that were required.

18   I was surprised to see it in all the briefing.  No one thought

19   to go that path.

20           THE COURT:  So the -- in fairness to Corizon, when I

21   think about a mortality review, not knowing any more than I do,

22   one purpose of a mortality review could be simply to document

23   what happened.

24           So that this single event in the life of a detention

25   sender is captured and not forgotten.  That's purpose one to be

1   historical.

2          Purpose two, and this starts to get us toward the

3   federal statute, is to do more than that.  It is to document,

4   to memorialize, to learn from and to implement corrective

5   action.

6          And so, not knowing what Corizon -- what Corizon's

7   policy says, it is required to do, and I think I will learn

8   that from the sentinel event --

9          MR. COYTE:  Yeah.

10          THE COURT:  -- I wonder if that policy stops there,

11   stops here at the historical chronological narrative or does

12   Corizon impose upon itself an obligation to do this evaluative

13   or corrective piece?  And Mr. Coyte, you've told me you haven't

14   read in a while.  Do you know the answer?

15          MR. COYTE:  Well, I would say, yeah, I think the

16   NHCCA -- the NCCHC standards requires three things, one of

17   which is a psychological assessment of what happened to learn

18   from it, which sort of gets to the quality aspect that you're

19   talking about.

20          The clinical monthly review or clinical review of it

21   to see what happen from an actual factual point of view.

22          And third, an administrative version.  So they're

23   much more thorough, the NCHCC standards of what you meant to

24   do.

25          Whether Corizon made their sentinel event policy to

1    match it correctly, one would hope they did.  I just don't have

2    that knowledge in my mind.

3            But there's no point writing this thing just for

4    historical purposes.  The point in writing it is to make sure

5    that deaths in our community jails have some accountability

6    associated with them.

7            You have to learn what happens in a jail, a closed

8    environment, where light does rarely shine in.

9            When someone dies, you better have a look and make

10   sure it's not bad behavior.  And that's why the contract

11   exists.  That's why the standard exists.

12           And the hospital requirement for privilege under the

13   federal law is incidental to that.  That's a lovely thing to

14   have for hospitals, but it really doesn't matter to a jail,

15   because you got to do it anyway.

16           THE COURT:  On that subject, what do you make of Mr.

17   Paoli's argument that granting this motion would be in effect

18   to carve out from the PSQIA in custody deaths?  And that's not

19   -- that shouldn't be the Court's job to create an exception.

20   That should be Congress' job.

21           MR. COYTE:  Yeah, I think the statute itself does it

22   for you because the in custody deaths have to have a review

23   anyway.  And the PSQIA does not apply to documents that have to

24   be written anyway.

25           THE COURT:  So --

1          MR. COYTE:  So you could call it custody death

2     exception, but it's any -- it's probably the only location

3     where it exists.

4          But that doesn't mean that the federal people who

5     wrote though law didn't anticipate organizations trying to

6     cover documents up by swapping their policy to move away from

7     making an NCCHC report and suddenly calling it a PSQIA report.

8          THE COURT:  The objection that you have to Mr.

9     Berumen seeking to invoke the privilege for his own work, I'm

10    trying to understand why you have that objection.

11         Without telling you what he has written, you have

12    heard me today say that my take on it is a historical narrative

13    of the care given to the decedent.  That's it.  That's all it

14    is.

15         But in order for there to be any meaningful review,

16    you have to start with a historical narrative of what happened.

17    Wouldn't that component be part and parcel of the review that

18    the privilege seeks to protect?

19         MR. COYTE:  I would think that if I was to really

20    want to do a self-critical analysis, I would take my medical

21    records of the events, maybe the videotapes of the events and

22    send them to an independent company to look at them with an

23    independent expert much as we have done as Plaintiffs in this

24    case, and then, reach a conclusion.

25              You don't need to ask him to review the history of

1    his own medical records, but then you might if had some

2    questions about what happened and you needed a statement from

3    him, like a witness statement.  So you could back and say, I'd

4    like to talk to you about what you did with your care.

5              But for him to create the report himself in some

6    effect, because I believe they identified him as one of the

7    authors of the report, that would seem to take it to so far

8    away from a self -- or a critical review analysis as to make it

9    meaningless unless he was asked to unburden himself in the

10   history analysis and self-criticize himself.

11             But I don't -- I wouldn't expect that to work either.

12   You need a third party to do it.

13             THE COURT:  Well, I wonder if this is just that his

14   contribution to a report was all preparatory to the third-party

15   providing the peer review for which Corizon contracted?

16             It seems to me that this is a process that is built

17   in phases and his on the ground narrative of what happened was

18   the first domino to fall, but there were people -- we've heard

19   today Ms. Newell, a doctor at on staff at Corizon and I'm sure

20   others were involved in whatever the rest of this evaluative

21   process was.  I just wanted to make sure I understood your

22   objection.

23             Let's talk about Judge Browning's Tanner decision.

24   And Mr. Coyte, some day, I will forgive you for making me read.

25   I'm not sure today is that day, but some day, I'll forgive you.

1          I have to say Mr. Paoli's on to something when he

2     points out that there was a difference in the declaration or

3     the evidence submitted to Judge Browning in that case for the

4     purpose of invoking the statute compared to what Corizon did in

5     this case with the Mooningham declaration.  And I want to give

6     you a chance to weigh in on that.

7          MR. COYTE:  Well, yeah, I think I sort of alluded it

8     -- to it earlier.  I am surprised that the litigants, the

9     Plaintiffs in that case asking for the documents didn't simply

10    point to the other alternative reasons why they had to provide

11    this document.

12         To go down this evidentiary review path, I thought,

13    was quite unnecessary for all parties.  And I know that they

14    had also claimed Roya (phonetic), the state statute and some

15    other privileges that might have taken them down that path as

16    well.

17         And I didn't look at the case that deeply to think

18    that that's why they did it.  But the PSQIA is a -- and I'm

19    doing and also as an aside there.  It could have been some of

20    the reasons was the relevancy, too.  I'm not sure if they

21    conceded relevancy.

22         Whereas in this case, no one has asserted that the

23    material isn't relevant.  So an evidentiary hearing or an in

24    camera review in my mind are totally unnecessary when you have

25    statutory or you have contractual or you have NCHCC standards

1    requirements, all of which the statute itself says you don't

2    get to insulate yourself from something you have to produce any

3    way.

4         And when I say produce, I mean, create, not give up.

5    Right?  So in that production where it keeps getting me tripped

6    up here because it's production meaning you create it.  If you

7    have to create it, then you don't get to use this statute.  If

8    you voluntarily create it, then it's a good statute to rely on

9    because you will encourage that and Corizon would be encouraged

10   to do this sort of thing, if not, for the fact that they have

11   no choice but to do this kind of thing.

12        And thus, you don't need to go the hard way down into

13   evidentiary depositions when was it written, who wrote it, what

14   was it for, did the county get a copy, did -- et cetera, et

15   cetera, et cetera.

16             THE COURT:  Well --

17             MR. COYTE:  Simple as that.

18             THE COURT:  -- it -- I wish it were.  Here's the

19   wrinkle.  Corizon has a contractual obligation to create

20   something called a mortality review.

21        I don't know and you guys don't know whether that is

22   synonymous with, co-terminus with and the same thing as the

23   five page report I've been given.

24        I don't know whether there's any additional

25   self-correcting self-evaluation dimension to what has been

1    withheld from you that is additional to what Corizon was

2    already required to create.

3            And so, I'm going to reserve judgment until I see

4    that policy.  I asked Mr. Paoli what treatment I should give an

5    unrebutted declaration.  And he gave me his answer.  And I'd

6    like yours.

7            MR. COYTE:  Well, I would give it the -- well, the

8    treatment I gave it I guess was the idea that it's contradicted

9    by the actual record that you have in front of you, that it

10   isn't the only reason why it's created.

11           And so, this person may think it's the only reason

12   it's created, but that without cross-examining or ensuring of

13   these contracts, yeah, I could imagine you're in front of the

14   Court, we bring her here and I would say, well, did you know

15   about the county contract.  And here's a copy.  Wouldn't you

16   agree that they have to create a document like this?

17           And I imagine the person would say, well, yeah, I

18   suppose they do.  And here's the NCCHC standards.  Wouldn't you

19   agree it required to create this elsewhere?  Yes.

20           So your document of your affidavit is not complete

21   and it's somewhat misleading, isn't it?  And I imagine I'd get

22   yes all the way through it.

23           THE COURT:  The NCCHC standards that you have sent to

24   me in Exhibit Number 5, is there any other standard besides

25   this one that speaks to any aspect of this question?  I don't

1      need to go digging through any more tulips to look for any more

2      legal authority, do I?  You rest on this?

3             MR. COYTE:  Yeah, I think the standard itself we gave

4      you is a piece of it.  And I can't remember if what I gave you

5      included the three parties I discussed.

6             There are three versions.  I don't think they do them

7      all the time these because these would marvelous if they did,

8      but the three versions of the review should take place.  And I

9      think that was encompassed in what if provided you and I rest

10     on that.

11            THE COURT:  Okay.  This one has -- this one has two,

12     the administrative review and then part two is the clinical

13     mortality review.

14            MR. COYTE:  Yeah, is -- sorry, I was wondering if I

15     missed.  The third is a psychological review.

16            THE COURT:  And it's in here.  And that is for a

17     psychological autopsy for deaths by suicide.

18            MR. COYTE:  No, I think it was a -- the one I'm

19     recollecting is an actual psychological review to the whole

20     death from the perspective of a -- of the organization.  No?

21            THE COURT:  That's not here.

22            MR. COYTE:  Oh, okay.  I think I've given you --

23     well, since what I've provided you is what I provided you, Your

24     Honor, I don't think it would be --

25            THE COURT:  All right.

1          MR. COYTE:  -- necessary to do anything else.

2          THE COURT:  Okay.  Let me see if --

3          MR. COYTE:  Unless, yeah, I mean, unless I could have

4    my staff look for the final piece to that, to see if I'm right

5    and let you know.

6          THE COURT:  Well, if --

7          MR. COYTE:  We could give you --

8          THE COURT:  -- it's -- I just want to have -- and I

9    want all of us to have --

10          MR. COYTE:  A full record, yeah.

11          THE COURT:  -- the full record and the proper

12    battlefield.  And I just -- earlier today, you had talked about

13    a psychological dimension to this, which was broader than

14    suicide.  And I just hadn't seen it.

15          MR. COYTE:  We'll get back to you if it exists by

16    tomorrow.

17          THE COURT:  So Mr. Coyte, those were the questions

18    that I have for you.  Based -- besides your answers today and

19    what you briefed to me, is there anything else that you wish to

20    emphasize?

21          MR. COYTE:  No, I think the emphasis is in custody

22    deaths are different to hospitals.  That's about it from the

23    Plaintiff's point of view.

24          THE COURT:  Okay.  Mr. Paoli, this isn't - again,

25    it's not your motion.  It is your burden.  I started with you

1    and I want to give you a chance to comment on any aspect of my

2    conversation with Mr. Coyte, if you wish to?

3              MR. PAOLI:  So none -- I don't have too much, Your

4    Honor.  I think the -- Your Honor picked up on the point here

5    with respect to the declaration from Ms. Mooningham essentially

6    being unrebutted.

7              I don't know necessarily that -- I tend to agree with

8    Mr. Coyte.  I don't know at this point the benefit of a lot of

9    little discovery on the issue, given kind of where we are and

10   ultimately the discovery requests that was sent to us basically

11   saying produce the mortality review.

12             There was no other document produced, other than the

13   documents that are claimed to be privileged.  So I'm not sure

14   that there's a ton of extra benefit to that.

15             You know, I suppose in all discovery disputes,

16   there's probably benefit to the parties trying to confer, but I

17   think ultimately, we're here because the parties had a little

18   bit of a disagreement with respect to the scope of the Tanner

19   decision and exactly how far that went.  And that's I think

20   what prompted Plaintiff to file the motion to compel.

21             THE COURT:  So the -- so here's where we're left, Mr.

22   Paoli.  Corizon had -- let's assume -- let's hypothesize that

23   there was no PSQIA.  Corizon had a contractual obligation to

24   conduct a mortality review and the NCCHC standard that Corizon

25   has adopted dictates what that mortality review needs to

1    consist of and it -- to the reasonable person contemplates the

2    production of a report as a working document, as a baseline

3    document.

4           As I sit here today, I'm virtually certain that what

5    you sent me is what Corizon would have created if the PSQIA

6    were not in the United States Code.

7           And through no fault of yours, you can't point to me

8    -- point me to any evidence that shows that Corizon complied

9    with its contractual obligation to the county unless that

10   compliance is reflected in the five page document you sent me

11   on Tuesday morning, correct?

12          MR. PAOLI:  That's correct, Your Honor.  I'm not

13   aware of any separate reporting to the county.  I'm just not.

14   I don't know of any.  I've never been informed of any.  I don't

15   know of any such separate document.

16          THE COURT:  All right.  Gentlemen, I wish I could

17   promise you that I would have a decision by the end of the

18   year, but I don't want to overpromise and under deliver.

19          But I will have an answer to you by the end of

20   January.  I'm the criminal court duty judge the first half and

21   then I have five settlement conferences the second half of

22   January, but I'll get you a decision but then.

23          And I know that this issue is pending before Judge

24   Swayze in another case.  And I talked to him, because I didn't

25   want us to have conflicting schedules about this and I think

1    he's going to wait to let me go first.

2            You know, he can get just persuasive authority on

3    East Central and Albuquerque if he wants, but I think he's

4    going to look for some guidance.

5            Which of you is going to send me the sentinel event

6    policy?

7            MR. COYTE:  Henry, do you want to do that or I'm

8    remote, so.

9            MR. PAOLI:  Yeah, so Your Honor, I'm happy to do

10   that.  Let - can I have until Monday, Your Honor?  The only

11   reason I bring that up is I was looking at the policy and

12   procedure manual that's been produced in discovery.  And I'm

13   not finding it very readily the sentinel event policy.  I need

14   to confer with the client.  I just don't -- I don't have a

15   ready explanation because the Court caught me a little off-

16   guard.

17           And so, I just ask for close of business Monday so I

18   can kind of get my head around what's going on on that issue.

19           THE COURT:  That's fine, that's fine.  And I'm

20   referring to whatever Corizon means in Plaintiff's Exhibit

21   Number 6.

22           MR. PAOLI:  Yeah.

23           THE COURT:  Yeah, that's fine, Monday is fine.

24           And Mr. Coyte, again, if what you have sent me in

25   Exhibit 5 is not the precise version of the NCCHC standard,

1   then you'll have until close of business Monday to send me the

2   substitute.

3                MR. COYTE:  Okay.

4                THE COURT:  All right, gentlemen.

5                Mr. Coyte, Merry Christmas in England.  Safe travels

6   back.

7                MR. COYTE:  Thank you.

8                THE COURT:  And I hope the weather there is better

9   than it normally is in December in England.

10               MR. COYTE:  There's actually snow out there.  It's

11  beautiful right now, but it's going to rain on -- on the

12  weekend.  And I wish you all in New Mexico happy Christmas,

13  too.

14               THE COURT:  Okay, and El Paso.  All right

15               MR. PAOLI:  Thank you.

16               MR. COYTE:  And El Paso, yes.

17               THE COURT:  Gentlemen, thank you very much.

18               MR. PAOLI:  Thank you, Judge.

19          (Proceedings concluded at 10:59 a.m.)

20

21

22

23

24

25

1                        **CERTIFICATE**

2

3

4          I, Chris Hwang, court approved transcriber, certify

5    that the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8

9

10

11

12

13    _____          December 30, 2022

14    Chris Hwang                 Date

15    Court Reporter

16

17

18

19

20

21

22

23

24

25