UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

HECTOR GARCIA JR., *personal*
*representative to the estate of Hector Garcia*,

    Plaintiff,

v.                                                                   Civ. No. 21-485 DHU/GJF

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF DOÑA ANA, et al.,

    Defendants.

## ORDER COMPELLING DISCOVERY

THIS MATTER is before the Court on Plaintiff's "Motion to Compel Discovery" ("Mot.") [ECF 71]. The Motion is fully briefed, and the Court heard extensive oral argument on December 15, 2022. *See id.*; ECFs 75 ("Resp."), 78 ("Reply"); 87 ("Tr.").[1] For the reasons explained below, the Court **GRANTS** the substantive relief sought in the Motion but **DENIES** the requested sanctions.

**I. BACKGROUND**

    **A. Parties and Underlying Facts**

Plaintiff represents the estate of his father, Hector Garcia ("Decedent"), a former inmate at the Doña Ana County Detention Center ("DACDC"). ECF 1 at ¶¶ 3–5. At all relevant times, Defendant Corizon Health, Inc. ("Defendant") has provided inmate health care services at DACDC pursuant to a contract with Doña Ana County ("the County"). *Id.* at ¶ 8. Decedent died on August 6, 2019, while incarcerated at DACDC. *Id.* at ¶ 5; Mot. at 1–3. In 2021, Plaintiff filed this action

---

[1] At the Court's request, the record also contains additional evidence obtained post-hearing. Plaintiff submitted an authenticated copy of its Exhibit 5, ECF 71-5, which the Court refers to as "Exhibit 7." Defendant submitted two versions of its Sentinel Event Policy, which the Court refers to as "Exhibit 8" (2015 rev. ed.) and "Exhibit 9" (2020 rev. ed.), respectively.

1

alleging that Defendant's "deliberate[ ] indifferen[ce] to [Decedent's] serious and obvious medical need" resulted in his death. Mot. at 3. That death led Defendant to conduct a "mortality review." *See* ECFs 71-1, 71-2.[2] The instant controversy concerns that review's[3] discoverability which, in turn, requires surveying Defendant's contractual duties and regulatory obligations as a carceral health care provider.

Pursuant to the DACDC contract, Defendant's obligations included "establish[ing] a mortality review process" in the event of inmate fatality and remaining in compliance with the "standards, regulations, and recommendations . . . [of] . . . the National Commission on Correctional Health Care" ("NCCHC"). ECFs 71-3 at 5.1.2.3, 71-4 at 2.0.[4] In August 2019, Defendant conducted mortality reviews according to the procedure outlined in its internal policy for "an event involving death or serious . . . injury"—the "Sentinel Event Review" process. Ex. 8 at 1. The Sentinel Event Review policy facilitated the "accreditation [of Defendant's] facilities" and documented Defendant's compliance with agency regulators and third parties. *See* Ex. 8 at 2, 4.

Separate from its contractual obligations to the County, Defendant executed another contract in 2015 with the Missouri Center for Patient Safety ("Missouri Center"). ECF 75-2 at ¶ 4.

---

[2] Because neither party at oral argument supplied the Court with a consistent and clear definition of "mortality review," the Court will use the term as defined by the standards incorporated by Defendant's contract with the County. *See, e.g.*, Tr. at 12:14–15:2; *see also* ECF 71-4; Ex. 7 ("A *clinical mortality review* is an assessment of the clinical care provided and the circumstances leading up to a death" (emphasis original)). The most natural interpretation of this definition, in light of the modern information-system realities of institutional health care providers, includes a written report memorializing the assessment.

[3] The mortality review at issue here is a five-page document submitted by Defendant *ex parte* titled "Notes for 10711 (Garcia Jr., Hector)."

[4] "[Defendant] shall establish a mortality review process. The DACDC must be informed as soon as feasible of any death . . . . Upon request from DACDC, [Defendant] shall participate in a specific meeting, such as a mortality and morbidity committee meeting after each death." ECF 71-3 at 5.1.2.3; *see also* ECF 71-4 at 20 (Defendant's contractual obligation to "fully comply" with the standards of the NCCHC); Ex. 7 (NCCHC standard demanding a clinical mortality review, a data log, and three topics germane to each review).

This second contract—also in effect during Decedent's incarceration[5]—contained Defendant's promise to improve patient safety by collaboratively analyzing mortality events with the Missouri Center. *See, e.g.*, *id.* at 9–10. Collaboration included supplying the Missouri Center with all information Defendant collected or produced "related to patient safety" including "sentinel event reviews, death reviews, and related documents." *Id.* Unlike its DACDC contract, Defendant's duties under the Missouri Center contract were "*voluntary and non-exclusive*." *Id.* at 10 (emphasis added).

### B. Procedural History

On July 14, 2022, Plaintiff requested the mortality review in his First Set of Interrogatories and Requests for Production. *See* ECF 47; *see also* Mot. at 4 (seeking "any morbidity, mortality, or death review, conducted by [Defendant], or any of its employees or agents, or any other agency"). Instead of disclosing the mortality review, however, Defendant withheld it as privileged under the federal Patient Safety Quality Improvement Act ("PSQIA"). *See* ECF 71-1; ECF 75-2 ("Declaration"). After attempting informal dispute resolution, Plaintiff filed the instant Motion on October 26, 2022, to compel Defendant's production of the mortality review. The Court conducted *in camera* review of the withheld document on December 13, 2022, and held oral argument on December 15, 2022. ECFs 83, 84.

## II. RELEVANT LAW

### A. Invoking Privilege During Discovery

Discoverable information constitutes "any nonprivileged matter that is relevant to a[ ] party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). A party can resist disclosure by asserting a privilege, but that party must expressly invoke the specific

---

[5] *Id.* at 18 (making this contract effective from October 2015 to 2018, at which point it would begin "automatically renew[ing] for successive 3-year periods").

privilege by name and describe "the nature of the [withheld matter] in a manner that . . . will enable other parties to assess the [privilege] claim" without divulging the privileged contents themselves. Fed. R. Civ. P. 26(b)(5)(A). If the party seeking discovery contests the privilege's applicability, the Federal Rules of Civil Procedure allow it to request judicial assistance. *See* Fed. R. Civ. P. 37(a)(3). A court will order disclosure unless the party asserting the privilege successfully carries the burden of establishing its applicability. *E.g.*, *United States v. Jarvison*, 409 F.3d 1221, 1231 (10th Cir. 2005) (citing *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1550 (10th Cir. 1995)).

### B. PSQIA Privilege

PSQIA provides one such privilege. That law created "a system in which health care providers can voluntarily collect . . . patient safety, health care quality, and health care outcome[ ]" information and report that data to a federally recognized "patient safety organization" ("PSO"). US Dep't Health & Human Servs., Patient Safety and Quality Improvement Act of 2005: HHS Guidance Regarding Patient Safety Work Product and Providers' External Obligations, 81 Fed. Reg. 32655, 32655 (2016) [hereinafter "HHS Guidance"]; *accord* 42 U.S.C. §§ 299b-21 to 299b-26.

To incentivize health care providers' participation, PSQIA offers them a statutory privilege against disclosure. The privilege applies to health-care-related information compiled *exclusively* for PSQIA purposes—"patient safety work product" ("PSWP"). *Id.*; 42 U.S.C. § 299b-21(7) (emphasis added). PSQIA defines PSWP as "any data, reports, records, memoranda, analyses . . . , or written or oral statements" which (1.a) a provider assembles for PSO-reporting purposes and does in fact report to a PSO, (1.b) a PSO developed for conducting "patient safety activities," or (2) "which identify or constitute the deliberations or analysis of, or identity the fact of reporting pursuant to" a patient safety evaluation system ("PSES"). 42 U.S.C. § 299b-21(7)(A)(i)–(ii). For

4

example, if a provider assembles such information "for reporting to a [PSO]" and does indeed report it to the PSO, that information could become PSWP. *Id.* at § (7)(A)(i)(I); *but see id.* at § 7(B), discussed *infra*.

Although PSWP is broadly defined, its definition is not without caveats. For the purposes of the instant Motion, the most important caveat is that the mere accumulation and tender of a document to a PSO does not automatically trigger PSWP's privilege protections—the material cannot be PSWP when, e.g., "collected, maintained, or developed" for non-PSQIA purposes. 42 U.S.C. § 299b-21(7)(B)(ii) (excluding "information that is collected, maintained, or developed separately, or exists separately, from a [PSES]. Such separate information . . . shall not by reason of its reporting be considered [PSWP]."); HHS Guidance, *supra*, at 32655.

### III. PARTIES' ARGUMENTS

Plaintiff's Motion and Reply collectively put forth three arguments. The Motion first contends that Defendant failed to carry its burden to assert a PSQIA privilege because: (a) the privilege log provides less information than Rule 26's threshold requirements and (b) the mortality review was "developed separately, or exists separately, from a [PSES]" by virtue of Defendant's independent, contractual obligations with the County and the Sentinel Event Review policy. *See* Mot. at 8–9. Next, citing an opinion by District Judge James O. Browning, he argues that PSWP categorically cannot apply to carceral health care providers because jails and prisons have independent contractual and regulatory obligations to produce mortality reviews notwithstanding the protection offered by PSQIA. *Id.* at 6, 9–10. In his Reply, Plaintiff adds that PSQIA's focus on "peer review" cannot credibly support extending PSWP privilege protections to a document reviewed by its own author because common sense dictates that such a review would not be "peer" review. Reply at 5–6.

For its part, Defendant responds in three ways.  First, Defendant asserts that it satisfied its Rule 26 privilege log requirements by expressly listing the mortality review's dates of creation, authors, recipients, purpose—"for 'reporting to a patient safety organization'"—and the specific privilege it intended to invoke, specifically the PSQIA privilege.  Resp. at 3–4.  Second, Defendant contends that it established the PSWP privilege's applicability because the mortality review: (a) contains information "related to patient safety," (b) was created for the "sole purpose of reporting to a PSO," (c) and was filed in Defendant's PSES, which transmits all its information to a federally recognized PSO.  *Id.* at 4–8; Decl. at ¶¶ 3–4, 6, 9–11.  Third, Defendant disputes Plaintiff's proposition that PSQIA exceptions exist for carceral deaths or documents created and reviewed by the same person—here, a named Defendant.  *Id.* at 9–12.

## IV.  DISCUSSION

### A.  The Privilege Log Complies with Rule 26 Requirements

As explained above, Rule 26 requires that a claim of privilege include: (i) express invocation of the privilege, and (ii) a description of the privileged material's nature and contents in a way that, short of disclosure, enables the requesting party to assess the claim.  Fed. R. Civ. P. 26(b)(5).  These requirements are purposefully broad to provide flexibility for each case's unique needs.  *See* Fed. R. Civ. P. 26(b)(5), Advisory Committee Notes, 1993 Amendment; *see, e.g.*, *Kannaday v. Ball*, 292 F.R.D. 640, 644–45 (D. Kan. Apr. 3, 2013).

Here, Plaintiff takes issue with the specificity of Defendant's privilege log.  *See* Mot. at 7–9 (referring to it as a "blanket" privilege claim).  However, the log expressly identifies the claimed privilege—PSWP—and provides Plaintiff with the mortality review's authors, recipients, and dates of creation.  ECF 71-2.  The log and the Declaration that Defendant attached to its Response also identify the mortality review's purpose as "reporting to a [PSO]."  *Id.*; *see also* Decl. at ¶ 17.

6

And the Court's *in camera* review revealed that the material Defendant claims as privileged is only a single five-page document. Tr. at 4:3–4.

Defendant's log adequately describes the purpose and details of the document. As courts in this district routinely hold, such level of detail, especially coupled with an affidavit, satisfies Rule 26's lenient standard. *See, e.g.*, *Ctr. for Biological Diversity v. Norton*, 336 F. Supp. 2d 1155, 1160–61 (D.N.M. July 20, 2004). Furthermore, this Motion makes patent that the information contained in the log was sufficient for Plaintiff to challenge the invocation of the privilege. The Court therefore finds and concludes that Defendant's privilege log satisfied Rule 26(b)(5) and rejects Plaintiff's assertion to the contrary.

### B. Defendant Failed to Carry Its Burden to Show that PSWP Applies

To be sure, however, the sufficiency of Defendant's privilege log does not equate to a finding that the PSWP privilege applies. Per the statutory and regulatory language, PSWP privilege depends on the intent behind producing the alleged PSWP. Answering that question requires the Court to evaluate Defendant's evidence regarding its intent, keeping in mind that Defendant bears the burden of establishing the privilege's applicability.

#### 1. Legal Standard

As explained above, Congress broadly defined PSWP—"any data, reports, records, memoranda, analyses . . . , or written or oral statements"—but narrowed its scope with two caveats: a purpose-based "clarification" and a content-based "clarification." *See* 42 U.S.C. § 299b-21(7)(B)(i)–(ii). PSWP's purpose-based exception carves out the "information that is collected, maintained, or developed *separately*, or *exists separately*, from a [PSES]. Such separate

information . . . *shall not by reason of its reporting* be considered [PSWP]." *Id.* at (7)(B)(ii) (emphasis added).[6]

The Department of Health and Human Services ("HHS")—tasked by Congress to interpret and implement PSQIA—promulgated a regulation and guidance that help to explain the statute. Indeed, HHS explains that:

> [PSQIA] was intended to spur the development of *additional* information created through voluntary patient safety activities and to provide privileges and confidentiality protections for such *new* information. It was not intended to protect records generated or maintained as part of providers' existing mandatory information collection activities.

HHS Guidance, *supra*, at 32657 (emphasis in original); *see generally id.* at 32655–59 (rejecting broad interpretations of PSWP that frustrate the disclosure of materials produced for contractual or regulatory reasons); *compare* Resp. at 3 (citing 73 Fed. Reg. 70732, 70741 (2008)) ("[I]nformation documented as collected within a [PSES] by a provider shall be protected as [PSWP]"), *with* HHS Guidance, *supra*, at 32658 ("[PSQIA] was not intended to give providers such methods to evade their regulatory obligations.").

Further, both the Executive and Congress during PSQIA's passage emphasized this purpose-based distinction. As President Bush promised, PSWP privilege reassures medical providers that they can candidly pour their collective intelligence into PSWP to learn from past mistakes, thereby avoiding preventable harm without fear that "the information they provide [could] be used against them in a lawsuit." *E.g.*, Statement by President George W. Bush Upon Signing S. 544, 2005 U.S.C.C.A.N. S11, 2005 WL 3693185 (July 29, 2005). And although Congress squarely considered "the chilling effect [that] the fear of being sued had on providers,

---

[6] PSWP also excludes certain content: a "patient's medical record, billing and discharge information, or any other original patient or provider record." 42 U.S.C. § 299b-21(7)(B)(i). But Defendant contends that the mortality review at issue is "separate and distinct from" Decedent's "patient and provider records" and Plaintiff does not challenge that contention. ECF 75-2 at ¶ 16.

[PSQIA] was not designed to prevent patients who believed they were harmed from obtaining the records about their care that they were able to obtain" before the law's enactment. HHS Guidance, *supra*, at 32655–56; *accord* S. Rep. No. 108-196, at 3 (2003) (detailing how Congress designed this law to remedy systematic deficiencies in American health care without relinquishing the means of keeping medical providers transparent and accountable).

### 2. Defendant's Evidence

Defendant insists that its purpose behind creating its mortality review in this case was exclusively "to identify opportunities for improvements in patient care." *E.g.*, Resp. at 6 (citing Decl. at ¶ 10). Plaintiff disagrees and provides his own evidence suggesting that Defendant had additional and nondiscretionary purposes for conducting the review and generating the report. Because Defendant carries the burden of establishing that PSQIA applies here, and because PSWP excludes information collected or created for nondiscretionary purposes, the Court must also examine what if anything Defendant has introduced to establish that PSWP's purpose-based caveat does not apply.

Defendant submitted two pieces of evidence in support of its singular-purpose position: (1) the sworn declaration of Tonya Mooningham, Defendant's "Patient Safety Program Manager," and (2) the Missouri Center contract. The Mooningham declaration asserts that Defendant produces mortality reviews solely for its PSES—i.e., exclusively for a PSQIA purpose. *Id.* (asserting that the mortality review is a "document[ ] created for the purpose" of PSES filing and PSO reporting). She emphasizes the PSES's broad scope, the vast array of informational sources from which it draws, and why all of that information—by virtue of being "created for the PSES"— is therefore made "for the sole purpose of" PSQIA. *See id.* at ¶¶ 6, 7, 9. Thus, she concludes that

9

such documents are properly considered protected PSWP.  *Id.* at ¶ 10; Tr. at 27:2–6 (suggesting that none of Plaintiff's exhibits contradict this declaration).

The Court is not so sanguine.  After all, quite apart from the Missouri Center contract, Defendant had an independent contractual obligation with the County to conduct a mortality review that satisfied the NCCHC standards.  The Mooningham Declaration is noticeably silent on the mortality review's relationship to the County's contract and whether the review could have been conducted for the dual purpose of satisfying that contract.  *See* Resp. at 8; *but see* ECF 71-3 (DACDC Contract); Ex. 7 (NCCHC standards incorporated by the DACDC Contract); Ex. 8 (Sentinel Event Review policy).  Moreover, the Declaration does not address whether Defendant could satisfy its NCCHC compliance obligation through any means other than the mortality review.  Indeed, the Sentinel Event Policy effective when the mortality in question occurred expressly contemplated using mortality reviews for "verification [with] accrediting entities (NCCHC, ACA, etc.)" and "NCCHC or other audits."  Ex. 8 at 2, 4; *e.g.*, Ex. 7 (requiring carceral providers to maintain a log containing specific information as part of its "[c]ompliance [i]ndicators").  The mere existence of the NCCHC standards strongly suggests a non-discretionary reason to produce a mortality review independent of Defendant's PSES or the enactment of PSQIA.  Take another example: the DACDC contract expressly entitles the County to news of any inmate fatality within two hours of death and, upon County request, mandates Defendant's participation in a County-facilitated "mortality and morbidity committee meeting."  ECF 71-3 at 5.1.2.3.  Yet whether those duties include sharing the mortality review with the County, the declaration does not say.[7]

---

[7] Defendant's silence on this point does not inure to its benefit.  Although it is theoretically possible that Defendant could send its agents into such meetings without the mortality review, the Court finds it highly unlikely that Defendant could satisfy the County's contractual right to information with a meeting "in which issues are openly discussed,

These omissions become particularly impactful given HHS's clarification of how PSQIA privilege applies, particularly with respect to the definition of PSWP. PSWP covers "additional information created through voluntary patient safety activities"—*not* records created, maintained, or aggregated into work product as part of "existing mandatory information collection activities." *Compare* HHS Guidance, *supra*, at 32657, *with* ECF 75-2 at 10 (affirming that Defendant's Missouri-Center-contractual duties are "voluntary and non-exclusive"). It follows that Defendant could have produced the mortality review not only for its PSES but also in the event that the County or NCCHC sought information. But Defendant's declaration fails to acknowledge—let alone dispute—the plausibility of dual-purpose intent behind creating the review.

Similarly, the Declaration fails to explain away the plausibility of Defendant producing the mortality review, notwithstanding the Missouri Center contract, because the 2015 Sentinel Event Policy required it. ECF 71-6 (highlighting Defendant's internal policy mandating mortality reviews "in accordance with [its] Sentinel Event Policy"); Tr. at 8:2–8; Ex. 8 ("*To assist in accreditation* for [Defendant], [its agents] should complete the Corizon Health Sentinel Event Review Checklist *for all mortalities* [which] serves as a document *of verification for accrediting entities* (NCCHC, ACA, etc.) that a mortality review process" occurred (emphasis added)). Rebutting this fact becomes particularly important after learning that Defendant knew of PSQIA as of June 19, 2015, yet its Sentinel Event Policy made no mention of the statute until the policy's revision in 2020. *Compare* ECF 75-2 at 30–31, *and* Ex. 9 (mentioning PSQIA explicitly in the policy's "Purpose" section), *with* Ex. 8 at 4 (omitting any mention of PSQIA and instead focusing

---

deficiencies identified[,] and corrective action implemented" yet deprive its representatives of access to the mortality review or some other format conveying the same information. *Id.*; *see also* Tr. at 52:21–53:12.

11

on state peer review laws and attorney-client privilege).⁸  The declaration fails to explain how "[s]entinel event reviews, death reviews, and related documents [are] created for the purpose of admission to [Defendant's] PSES" despite the internal policy that mandated such reviews making no mention of PSES or PSQIA at all.  Absent further explanation, the declaration leaves troubling and unanswered questions concerning how Defendant created this mortality review for purely PSQIA purposes when other non-discretionary purposes compelled the same review.  ECF 75-2 at ¶ 10; *compare* Resp. at 6 (citing HHS Guidance) (emphasizing that the mortality review was created for Defendant's PSES and reported to a PSO), *with* HHS Guidance at 32658 ("[I]t would be improper to maintain records collected for external reporting purposes solely within a PSES because this scenario would be a misuse of a PSES."), *and id.* at 32656 n.4 ("For example, a provider may have an external obligation to maintain certain records about serious adverse events that result in patient harm.  The document the provider prepares to meet its requirement about such adverse events is not PSWP.").

At bottom, the Court has reason to question that "the [mortality review] w[as] created for the purpose of reporting to a [PSO] and [was] in fact transmitted to the PSO." Resp. at 8.  At best, Defendant could only have created the document with dual purposes in mind, but PSWP does not extend to information collected or published pursuant to a separate, existing reporting obligation. "The intent of the system . . . is to protect the *additional* information created through voluntary patient safety activities, not to protect records created through providers' mandatory information collecting activities."  *See* HHS Guidance, *supra*, at 32655 (emphasis added).

---

⁸ This case required the Court to examine only the Sentinel Event Policy that was in place at the time of Decedent's mortality review.  The Court recognizes that Defendant thereafter made significant changes to the policy and appears to have anchored the new policy to the PSQIA.  The Court expresses no opinion as to the legal effect, if any, of these changes or whether they would have dictated a different outcome of the instant Motion.

For these reasons, and mindful that "[t]he party seeking to assert a privilege has the burden of establishing its applicability," *United States v. Lopez*, 777 F.2d 543, 552 (10th Cir. 1985), the Court is not persuaded that Defendant's stated purpose in crafting the mortality review report was to the exclusion of other apparently applicable and non-discretionary purposes. The Court concludes that Defendant has failed to carry its PSQIA burden because it did not show both that the mortality review fit within the "broad terms" of PSQIA's definition and that it fell outside the narrow terms of PSWP's two "clarifications." Resp. at 6 (citing 42 C.F.R. § 3.20).

### C. No Categorical Exception Exists Under PSQIA for Carceral Deaths

But Plaintiff goes a step further. Rather than confine his argument to Defendant's evidentiary burden, Plaintiff urges the Court to read into PSQIA two categorical exceptions. The first, he argues, should be that PSQIA "does not apply to documents in a custodial setting" as a bright-line rule because contractual obligations and regulatory requirements, which are ubiquitous in the carceral health care context, almost always require the creation of these types of documents. *See* Mot. at 8. In support, Plaintiff quotes dicta from a federal district court in New Mexico about PSQIA's broad purpose. *Id.* (citing *Tanner v. McMurray*, 405 F. Supp. 3d 1115, 1211 (D.N.M. May 7, 2019)). But that case presented no opportunity to address the carceral industry as a whole because "there [was] no evidence . . . that the documents . . . were produced for the purpose of reporting to a PSO . . . [which] do[es] not meet the *foundational* requirements for [PSWP] qualified for protection under [PSQIA]. *Tanner*, 405 F. Supp. 3d at 1211 (emphasis added). Put differently, the privilege-invoking party in *Tanner* failed to show that the documents met PSWP's broad § 7(A) threshold, so the *Tanner* court had no occasion to consider whether the alleged PSWP avoided PSWP's § 7(B) caveats. The overbreadth of Plaintiff's argument becomes increasingly visible after noting that the language plucked from *Tanner* focuses on policy rationale without

13

consideration of a categorical exception. *See* Mot. at 10 (quoting *Tanner*, F. Supp. 3d at 1203). Thus, because Plaintiff lacks support for the bright-line rule he proposes, the Court declines his invitation to read a categorical exception into PSQIA that Congress apparently never considered and has not endorsed.

### D. No Categorical Exception Exists for Reports Authored by Named Defendants

Plaintiff also urges the Court to adopt a categorical PSQIA exemption for documents where any portion of the "peer review" process involved a person reviewing their own work. Plaintiff reasons that PSQIA's focus on "peer review" inherently cannot apply to the review of an adverse medical incident conducted by a participant in the underlying incident's treatment attempt. Reply at 5–6. But compared to the carceral context exception asserted above, this construction rests on even shakier grounds. Plaintiff cites no authority for his proposition and justifies the deficiency because "it is extremely difficult to provide authority for a principle that is so obvious [that] no one has credibly litigated it." *Id.*

This Court is not in the business of reading exceptions into statutes based on common-sense opinions of how Congress could have crafted a better statute. Instead, the Court's task is to construe a statute according to its plain meaning at the time of its enactment. *E.g.*, *Am. Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 201 (Scalia, J., concurring). And Plaintiff marshals no authority to support his assertion that Congress intended to require a minimum of two entities involved in all PSQIA review—the underlying incident's participants and some removed third party—so the Court will not overstep its authority by creating such a requirement here.

### D. Defendant's Argument Was "Substantially Justified"

Having resolved the discovery dispute, the Court is left only to determine whether Plaintiff should be awarded the costs and fees he requests. *See* Mot. at 10, Resp. at 6. Unless the non-

14

movant's litigation position was, *inter alia*,[9] "substantially justified," Rule 37(a)(5) obligates a federal court to impose monetary sanctions against the party that comes out on the losing end of a motion to compel. Fed. R. Civ. P. 37(d)(1)(A)(ii). Substantial justification requires only a "legitimate position[ ]," *N.M. ex rel. Balderas v. Real Estate L. Ctr.*, 429 F. Supp. 3d 996, 1008 (D.N.M. December 9, 2019). A legitimate position rests soundly on any "justifi[cation] to a degree that could satisfy a reasonable person." *E.g.*, *Lester v. City of Lafayette*, 639 F. App'x 538, 542 (10th Cir. 2016) (unpublished) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).

Defendant asserts that its discovery position was "substantially justified" such that, even if the Court granted Plaintiff's Motion, an award of fees under Rule 37 would be unwarranted. Resp. at 13–14. In support, Defendant highlights the lack of on-point Tenth Circuit authority regarding the scope of PSWP's definition and insists that it was reasonable to litigate the issue. Resp. at 13. Further, Defendant points out that Plaintiff's request for costs and fees "cites no authority to suggest [Defendant's] position is unreasonable." *Compare* Resp. at 12, *with* Mot. at 10, *and* Reply at 6.

Rule 37(a)(5) sets out an admittedly forgiving standard. *See* Fed. R. Civ. P. 37(a)(5), Advisory Committee Notes, 1970 Amendment ("On many occasions, . . . the dispute over discovery between the parties is genuine, though ultimately resolved one way or [an]other . . . . In such cases, the losing party is substantially justified in carrying the matter to court."). Due to the necessity of clarifying unsettled areas of law, courts applying Rule 37(a)(5) routinely consider discovery positions in such circumstances to be "substantially justified." *See, e.g.*, *Tierra Blanca Ranch High Country Youth Program v. Gonzales*, 329 F.R.D. 694, 699 (D.N.M. Jan. 8, 2019) ("Considering the unsettled law . . . the Court finds that [the non-movant's] grounds were

---

[9] Neither party mentions the other exceptions—if the movant failed to first attempt informal resolution or if "other circumstances" justify not awarding cost and fees—so the Court will not address them. *Id.* at (a)(5)(i), (iii).

'substantially justified.'"); *cf. Pruess v. Presbyterian Health Plan, Inc.*, No. CIV 19-629 KG/JFR, 2022 WL 304571, at *10 (D.N.M. Jan. 12, 2022) (awarding sanctions for "stonewall[ing]" discovery requests with perfunctory answers like "it's a process" or that his clients "are working on it").

The Court finds Plaintiff's request for sanctions insufficient to justify an award of costs and fees. Not only does he fail to make even a passing reference to Rule 37(a), but he also "ha[s] not discussed" the Rule, has not analyzed it, nor has he "developed a cogent argument as to how" Defendant's conduct justifies sanctions here. Mot. at 10; Reply at 6, *but see, e.g.*, *Certain Syndicate Subscribers to Down Side v. Lasko Prods., Inc.*, Civ. No. 08-0220 MCA/DJS, 2010 WL 11509155, at *1 (D.N.M. Mar. 18, 2010) (unreported) (declining to award monetary sanctions because the movant offered no real argument). Given the lack of articulated challenge from Plaintiff, the Court has no reason to question Defendant's substantial justification defense. Indeed, the legal and factual issues involved in the instant Motion were not easy to resolve and presented close questions on which reasonable minds can certainly differ. Thus, the Court will not award sanctions for Defendant's refusal to disclose the mortality review on PSQIA privilege grounds.

## IV. CONCLUSION

For the foregoing reasons, **IT IS THEREFORE ORDERED** that, **no later than January 13, 2023**, Defendant shall supplement its response to Plaintiff's first interrogatory and request for production by producing the mortality report in full.

**SO ORDERED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE